AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

### for the Central District of California

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>v.<br><br>MATTHEW JAMES PEREZ,<br>  also known as "Neer,"<br>DANIEL AGUILERA, and<br>JAY COLBY SANFORD,<br>  also known as "Monte Jay,"<br><br>  Defendants. | Case No.<br><br>**(UNDER SEAL)**<br><br><br>19 MJ 00573 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. Beginning on a date unknown, and continuing until at least the date of this complaint, in Los Angeles County, within the Central District of California, and elsewhere, defendants **MATTHEW JAMES PEREZ**, also known as "Neer," **DANIEL AGUILERA**, and **JAY COLBY SANFORD**, also known as "Monte Jay," and others known and unknown conspired and agreed with one another to knowingly and intentionally distribute controlled substances, in violation of the following:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to Distribute Controlled Substances |

This criminal complaint is based on these facts:  Please see attached affidavit.

☒ Continued on the attached sheet.

_____
*Complainant's signature*

LaNard Taylor, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  2/19/19

_____
*Judge's signature*

SUZANNE H. SEGAL

City and state:  Los Angeles, California

United States Magistrate Judge
*Printed name and title*

AUSAs: Lindsey Greer Dotson (x4443), Joseph Axelrad (x7964)

## Table of Contents

I.   INTRODUCTION ........................................... 1

II.  PURPOSE OF AFFIDAVIT ................................. 2

III. PROPERTY TO BE SEARCHED ............................. 3

IV.  ITEMS TO BE SEIZED .................................. 3

V.   SUMMARY OF PROBABLE CAUSE ........................... 4

VI.  STATEMENT OF PROBABLE CAUSE ......................... 7

    A.   Background: ANTRIM, MCBRIDE, and RODRIGUEZ
        Are Charged and Sign Plea Agreements Admitting
        Their Involvement in the Warehouse Robbery ...... 7

    B.   Surveillance Video Captures **PEREZ** and **AGUILERA**
        Participating in the Warehouse Robbery .......... 9

        1.   **PEREZ** Purports to be an Armed Deputy
            Sheriff During the Robbery and Brandishes
            a Long-Gun ................................. 9

        2.   **AGUILERA** Drives the Penske Truck to
            the Warehouse to Transport the Stolen
            Marijuana and Money ...................... 10

    C.   Corroborating Evidence Confirms That **PEREZ**
        and **AGUILERA** Participated in the Warehouse
        Robbery ........................................ 12

        1.   **PEREZ** Communicates with MCBRIDE, **AGUILERA**,
            and **SANFORD** During the Robbery to
            Facilitate the Heist ..................... 12

        2.   **AGUILERA** Communicates with MCBRIDE and
            **PEREZ** During the Robbery to Facilitate
            the Heist ................................ 17

        3.   Cell-Site Data Confirms that **AGUILERA** Was
            Near the Warehouse During the Robbery ..... 20

    D.   **SANFORD** Serves as a Nearby Look-Out During the
        Robbery ........................................ 21

        1.   **SANFORD's** Cellular Phone ................. 22

        2.   Toll Records Show That **SANFORD** Communicated
            with MCBRIDE and **PEREZ** Around the Time of
            the Robbery .............................. 23

3.   Text Messages Between **SANFORD** and MCBRIDE
     Show that **SANFORD** Served as a Look-Out
     During the Robbery ........................ 24

4.   Cell-Site Data Corroborates That **SANFORD**
     Was Near the Warehouse During the
     Robbery .................................. 25

5.   Surveillance Video Captures a Vehicle
     Resembling **SANFORD's** Truck Near the
     Warehouse During the Robbery ............. 27

E.   MCBRIDE Tells ANTRIM That He Is Going to Pay
     **PEREZ, AGUILERA**, and **SANFORD** for Their Help
     With the Robbery .............................. 28

F.   The SUBJECT PREMISES and DEVICES .............. 28

VII.  TRAINING AND EXPERIENCE REGARDING THE SUBJECT
      OFFENSES ........................................... 34

VIII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES ......... 40

IX.   REQUEST FOR NIGHTTIME SERVICE ...................... 44

X.    REQUEST FOR NO-KNOCK ENTRY ......................... 45

XI.   CONCLUSION ......................................... 46

## AFFIDAVIT

I, LANARD TAYLOR, being duly sworn, declare and state as follows:

## I.    INTRODUCTION

1.    I am employed as a Special Agent ("SA") for the Federal Bureau of Investigation ("FBI") and have been so employed since June of 2016. I am presently assigned to one of the Los Angeles Field Office Public Corruption squads, where I am responsible for investigating violations of federal law by public officials at the federal, state, and local levels of government. I was previously assigned to the FBI's Palm Springs Resident Agency, where I was responsible for investigating violent crime, narcotics offenses, and a host of other violations of federal law.

2.    I received over 800 hours of formal training at the FBI Academy in Quantico, Virginia. Through the FBI Academy and continuing education, I have received extensive training in criminal case management, investigative techniques, computer technology, digital device handling, evidence collection, cellular site data analysis, and the execution of search and seizure warrants, among other things.

3.    Prior to my employment with the FBI, I was a law enforcement officer in the State of Florida for four years, where I investigated crimes relating to narcotics, robbery, burglary, false imprisonment, kidnapping, and a variety of other violent criminal acts.

1

Instrumentality Protocol

## II.  PURPOSE OF AFFIDAVIT

4.   This affidavit is made in support of a criminal
complaint against, and arrest warrants for, **MATTHEW JAMES PEREZ**,
also known as "Neer" (**"PEREZ"**), **DANIEL AGUILERA** (**"AGUILERA"**),
and **JAY COLBY SANFORD**, also known as "Monte Jay" (**"SANFORD"**),
for Conspiracy to Distribute Controlled Substances, in violation
of 21 U.S.C. § 846.  This affidavit is also made in support of
search warrants for the SUBJECT PREMISES and DEVICES, as
detailed herein and described in Attachments A-1 through A-6,
for the items to be seized, as described in Attachment B.
Attachments A-1 through A-6 and B are incorporated herein by
reference.

5.   The facts set forth in this affidavit are based upon
my training and experience, review of recordings, interviews of
witnesses, and information obtained from various law enforcement
agencies, including but not limited to the Drug Enforcement
Administration ("DEA"), Bureau of Alcohol, Tobacco, Firearms and
Explosives ("ATF"), and the Los Angeles County Sheriff's
Department ("LASD").  This affidavit is intended to show merely
that there is sufficient probable cause for the requested
complaint, arrest warrants, and search warrants.  It does not
purport to set forth all of my knowledge of, or investigation
into, this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

2

Instrumentality Protocol

### III. **PROPERTY TO BE SEARCHED**

6. This affidavit is made in support of search warrants for the following SUBJECT PREMISES and DEVICES:

a. SUBJECT PREMISES 1. The premises located at 1132 West Philadelphia Street, Ontario, California 91762 ("SUBJECT PREMISES 1"), as described in Attachment A-1;

b. SUBJECT PREMISES 2. The premises located at 1202 Glennfield Court, Apartment 196, Los Angeles, California 90023 ("SUBJECT PREMISES 2"), as described in Attachment A-2;

c. SUBJECT PREMISES 3. The premises located at 939 North Gordon Street, Pomona, California 91768 ("SUBJECT PREMISES 3"), as described in Attachment A-3;

d. SUBJECT DEVICE 1. Any digital device, including but not limited to a cellular telephone, in the possession, custody, or control of **PEREZ** at the time of his arrest, as described in Attachment A-4;

e. SUBJECT DEVICE 2. Any digital device, including but not limited to a cellular telephone, in the possession, custody, or control of **AGUILERA** at the time of his arrest, as described in Attachment A-5; and

f. SUBJECT DEVICE 3. Any digital device, including but not limited to a cellular telephone, in the possession, custody, or control of **SANFORD** at the time of his arrest, as described in Attachment A-6.

### IV. **ITEMS TO BE SEIZED**

7. The items to be seized are the evidence, fruits, and instrumentalities of violations of the following: 21 U.S.C.

3

Instrumentality Protocol

§ 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances); 21 U.S.C. § 841(a)(1) (Distribution and Possession with Intent to Distribute Controlled Substances); 18 U.S.C. § 241 (Conspiracy Against Rights); 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law); 18 U.S.C. § 371 (Conspiracy); 18 U.S.C. § 922(g)(1) (Possession of a Firearm or Ammunition by a Prohibited Person); 18 U.S.C. § 924(c) (Carrying or Using a Firearm in Furtherance of a Drug Trafficking Crime); 18 U.S.C. § 1956 (Money Laundering); and 18 U.S.C. § 1957 (Money Laundering in Property from Specified Unlawful Activity) (collectively, the "Subject Offenses"), as described in Attachment B.

## V. SUMMARY OF PROBABLE CAUSE

8.     On or about October 29, 2018, MARC ANTRIM ("ANTRIM"), an off-duty LASD deputy sheriff, KEVIN MCBRIDE ("MCBRIDE"), ERIC RODRIGUEZ ("RODRIGUEZ"), **PEREZ, AGUILERA, SANFORD**, and others known and unknown were involved in the robbery of an indoor marijuana distribution warehouse (the "Warehouse") in Los Angeles, California.

9.     Dressed as armed LASD deputies, ANTRIM, MCBRIDE, and **PEREZ** arrived at the Warehouse at approximately 3 a.m., falsely portraying themselves as law enforcement officers executing a search warrant.   ANTRIM and MCBRIDE each possessed a handgun

4

Instrumentality Protocol

holstered in a duty belt.[1] **PEREZ**, a convicted felon[2], appeared
to have a holstered handgun as well. In addition, **PEREZ** openly
carried and brandished what appeared to be a long-gun, similar
to an assault rifle. ANTRIM detained three security guards in
the backseat of an LASD Ford Explorer. **AGUILERA** arrived shortly
thereafter in a large Penske moving truck (the "Penske Truck")
rented by ANTRIM. ANTRIM, MCBRIDE, **PEREZ**, and **AGUILERA** then
began loading the Penske Truck with bags of marijuana and other
items from the Warehouse. While the robbery was taking place,
**SANFORD** served as a nearby lookout, scouting for law enforcement
or other threats.

4. During the robbery, which lasted approximately two
hours, Los Angeles Police Department ("LAPD") officers
legitimately responded to a call for service at the Warehouse.
When the LAPD officers arrived, MCBRIDE and **PEREZ** discarded
their law enforcement paraphernalia and fled through a back
door. **AGUILERA** also fled. ANTRIM remained at the Warehouse,
showed the LAPD officers his LASD badge, and falsely claimed
that he was conducting a legitimate search, thereby prompting
the LAPD officers to leave the Warehouse.

5. After the LAPD officers had left the Warehouse,
MCBRIDE returned. RODRIGUEZ and another co-conspirator arrived
at the Warehouse around the same time. ANTRIM, MCBRIDE,

---

[1] A duty belt is a type of belt often worn by law
enforcement officers that usually contains handcuffs, a radio,
and a firearm, among other things.

[2] Based on my review of law enforcement database queries, I
am aware that **PEREZ** has at least two felony convictions.

5

Instrumentality Protocol

RODRIGUEZ, and the fourth man then completed the robbery, stealing approximately 1,226 pounds of marijuana[3] and two large commercial safes, containing at least $615,000 in cash and approximately $30,000 in money orders.[4]

6. On or about November 8, 2018, agents searched the homes of ANTRIM, MCBRIDE, and RODRIGUEZ pursuant to search warrants issued by the Honorable Edward M. Infante, United States Magistrate Judge, in case numbers 18-MJ-2958, 18-MJ-2959, and 18-MJ-2960. From my conversations with the agents who conducted each of those searches, I am aware that agents seized over $150,000 in cash and four firearms from ANTRIM's residence. From MCBRIDE's residence, agents seized over $150,000 in cash, a loaded firearm, and two bags each containing approximately 455 grams of marijuana that appeared to have been packaged for commercial distribution. Agents also recovered a metal patrol-type flashlight with "Antrim" etched into it, an LASD field interview card, two-way radio, and men's boots resembling those worn by MCBRIDE during the robbery. Finally, from RODRIGUEZ's residence, agents seized marijuana and marijuana products that appeared to have been packaged for commercial distribution, two firearms, a taser, and ammunition. From my involvement in the

---

[3] Based on my training and experience and conversations with DEA special agents, I am aware that 1,226 pounds of marijuana is a distribution quantity of marijuana.

[4] Based on my review of the information and plea agreements signed by ANTRIM, MCBRIDE, and RODRIGUEZ, which are detailed herein and incorporated by reference, I am aware of the items stolen during the robbery. I am also aware of the items stolen during the robbery based on information provided by attorneys representing the Warehouse and its owners.

6

Instrumentality Protocol

investigation, I am aware that agents have yet to recover all of the remaining money and marijuana stolen during the robbery.

## VI. STATEMENT OF PROBABLE CAUSE

### A. Background: ANTRIM, MCBRIDE, and RODRIGUEZ Are Charged and Sign Plea Agreements Admitting Their Involvement in the Warehouse Robbery

10. For their involvement in the Warehouse robbery, a criminal complaint against ANTRIM and RODRIGUEZ was filed on November 7, 2018, in case number 18-MJ-2983 and sworn to before Judge Infante. (18-MJ-2983 dkt. 1.) A related complaint against MCBRIDE was filed November 9, 2018, in case number 18-MJ-2999 and sworn to before the Honorable Alka Sagar, United States Magistrate Judge. (18-MJ-2999 dkt. 1.) The MCBRIDE complaint, which includes the ANTRIM/RODRIGUEZ complaint as an exhibit, is attached hereto as Exhibit 1 and incorporated by reference.

11. On January 11, 2019, an information was filed against ANTRIM, MCBRIDE, and RODRIGUEZ in case number 19-CR-18-VAP, and is incorporated herein by reference. (19-CR-18-VAP dkt. 34.)

12. In a signed plea agreement incorporated herein by reference, ANTRIM has agreed to plead guilty to the following: Conspiracy to Distribute and Possess with Intent to Distribute Marijuana, in violation of 21 U.S.C. § 846; Possession with Intent to Distribute Marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vii); Conspiracy Against Rights, in violation of 18 U.S.C. § 241; Deprivation of Rights Under Color of Law, in violation of 18 U.S.C. § 242; Using, Carrying, and Brandishing a Firearm During and in Relation to, and Possessing

7

Instrumentality Protocol

a Firearm in Furtherance of, a Drug Trafficking Crime, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii); and Aiding and Abetting, in violation of 18 U.S.C. § 2(a). (See 19-CR-18-VAP dkt. 39.) ANTRIM's change of plea has not yet occurred.

13. In a signed plea agreement incorporated herein by reference, MCBRIDE has agreed to plead guilty to the following: Conspiracy to Distribute and Possess with Intent to Distribute Marijuana, in violation of 21 U.S.C. § 846; Possession with Intent to Distribute Marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vii); Conspiracy Against Rights, in violation of 18 U.S.C. § 241; Deprivation of Rights Under Color of Law, in violation of 18 U.S.C. § 242; Using and Carrying a Firearm During and in Relation to, and Possessing a Firearm in Furtherance of, a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i); and Aiding and Abetting, in violation of 18 U.S.C. § 2(a). (See 19-CR-18-VAP dkt. 40.) MCBRIDE's change of plea has not yet occurred.

14. In a signed plea agreement incorporated herein by reference, RODRIGUEZ has agreed to plead guilty to the following: Conspiracy to Distribute and Possess with Intent to Distribute Marijuana, in violation of 21 U.S.C. § 846; Possession with Intent to Distribute Marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vii); Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g); and Aiding and Abetting, in violation of 18 U.S.C. § 2(a). (See 19-CR-18-VAP dkt. 51.) RODRIGUEZ's change of plea has not yet occurred.

8

Instrumentality Protocol

15. The aforementioned complaints (see Exhibit 1), information, and plea agreements contain a detailed account of the Warehouse robbery, including the events described above in Section V (Summary of Probable Cause).

## B. Surveillance Video Captures PEREZ and AGUILERA Participating in the Warehouse Robbery

16. As detailed in the aforementioned criminal complaints (see Exhibit 1), surveillance video of the Warehouse captured the robbery in progress from 32 different camera angles. I have reviewed the surveillance camera footage.

### 1. PEREZ Purports to be an Armed Deputy Sheriff During the Robbery and Brandishes a Long-Gun

17. From my close and repeated review of the surveillance camera footage, review of a California driver license photograph of **PEREZ**, and review of publicly-available social media accounts associated with MCBRIDE and **PEREZ** and photographs of **PEREZ** posted to those accounts, I believe that **PEREZ** was the third individual who arrived in the LASD Ford Explorer with ANTRIM and MCBRIDE. (Additional corroborating evidence detailed herein further supports my belief.) From the surveillance video, I saw that **PEREZ**, like ANTRIM and MCBRIDE, was dressed as a deputy sheriff. **PEREZ**, who is not an LASD deputy sheriff[5], wore a green jacket with what appeared to be LASD patches on the sleeves. He also appeared to have a holstered handgun. When he got out of the LASD Ford Explorer, he brandished what appeared to be a

---

[5] According to Sergeant Vincent Choi ("Sergeant Choi"), a member of LASD's Internal Criminal Investigations Bureau tasked with investigating crimes committed by LASD employees, **PEREZ** has never been employed as an LASD deputy sheriff.

9

long-gun, similar to an assault rifle commonly carried by law enforcement during enforcement actions.

18. From the surveillance video, I saw that **PEREZ** assisted with the robbery, helping steal what appeared to be bags of marijuana from the Warehouse. At approximately 3:43 a.m., several marked LAPD police cars began arriving at the Warehouse.[6] As the LAPD police cars arrived, ANTRIM walked toward the front gate of the Warehouse parking lot. At the same time, MCBRIDE, **PEREZ**, and a third co-conspirator (**AGUILERA**, as detailed herein) fled the Warehouse through a back roll-up door. **PEREZ** appeared to throw his LASD jacket and other items, including possibly a firearm, in a bush next to the Warehouse. Based on my training and experience and involvement in this investigation, the fact that **PEREZ** shed his LASD jacket and fled when LAPD officers arrived on scene shows consciousness of guilt, i.e. that he knew he was not part of any legitimate law enforcement team conducting a legal search and seizure.

### 2. **AGUILERA** Drives the Penske Truck to the Warehouse to Transport the Stolen Marijuana and Money

19. From my close and repeated review of the surveillance camera footage, review of a California driver license photograph of **AGUILERA**, and review of publicly-available social media accounts associated with MCBRIDE and **AGUILERA,** as well as photographs of **AGUILERA** posted to those accounts, I believe that

---

[6] From my review of the complaints against ANTRIM, MCBRIDE, and RODRIGUEZ (see Exhibit 1), I know that Sergeant Choi reviewed LAPD calls for service on or about October 29, 2018 and learned that a caller reported that individuals purporting to be officers were attempting to execute a search warrant at the Warehouse.

10

**Instrumentality Protocol**

**AGUILERA** was the co-conspirator who drove the Penske Truck into the Warehouse parking lot during the robbery. (Additional corroborating evidence detailed herein further supports my belief.)

20. Based on my review of records from Penske, I know that ANTRIM rented the Penske Truck used to transport the stolen marijuana, cash, and money orders. From my review of the surveillance camera footage, I know that **AGUILERA** drove the Penske Truck into the Warehouse parking lot after ANTRIM had detained the Warehouse employees. **AGUILERA** parked the Penske Truck near the front entrance to the Warehouse and assisted ANTRIM, MCBRIDE, and **PEREZ** with stealing what appeared to be bags of marijuana from the Warehouse. **AGUILERA** was not dressed as a law enforcement officer.

21. From my review of the surveillance camera footage, I know that when LAPD officers legitimately responded to a call for service at the Warehouse, **AGUILERA** fled the Warehouse with MCBRIDE and **PEREZ**. Based on my training and experience and involvement in this investigation, the fact that **AGUILERA** fled when LAPD officers arrived on scene shows consciousness of guilt, i.e. that he knew he was participating in a robbery and had no legal right to take any of the items stolen during the robbery.

11

Instrumentality Protocol

## C. Corroborating Evidence Confirms That PEREZ and AGUILERA Participated in the Warehouse Robbery

### 1. PEREZ Communicates with MCBRIDE, AGUILERA, and SANFORD During the Robbery to Facilitate the Heist

22. Based on my training and experience and involvement in this investigation, I believe that **PEREZ** is the user of a cellular telephone with phone number (626) 367-1442 ("**PEREZ's** phone") for the following reasons, among others:

a. Subscriber records indicate that **PEREZ's** phone is subscribed to **PEREZ.** From my training and experience, the subscriber of a phone is often the user.

b. Subscriber records also indicate that **PEREZ's** phone is subscribed to him at 321 South Albertson Avenue, Covina, California 91723. As detailed herein, I understand that **PEREZ** lived at this address in Covina until on or about January 26, 2019, when he thereafter moved to his current residence (SUBJECT PREMISES 1). Based on my training and experience, the fact that **PEREZ's** phone is subscribed to him at an address where he recently resided further supports my belief that **PEREZ** is the user.

c. Based on my review of MCBRIDE's phone, pursuant to a search warrant issued by Judge Infante in case number 18-MJ-2958, I am aware that phone number (626) 367-1442 (**PEREZ's** phone) is saved in MCBRIDE's phone under the name "Neer." Based on my involvement in this investigation, I understand that "Neer" is a nickname for **PEREZ**.

12

**Instrumentality Protocol**

d. On December 18, 2018, in case number 18-MJ-3335, the Honorable Maria A. Audero, United States Magistrate Judge, issued a warrant authorizing the disclosure of historical cell-site information and prospective cell-site and GPS information and the use of cell-site simulator for **PEREZ's** phone, among others. GPS data obtained for **PEREZ's** phone pursuant to this warrant, along with surveillance that I conducted, further confirms that **PEREZ** is the user of the phone.

i. On or about January 2, 2019, at approximately 8:04 a.m., GPS data showed that **PEREZ's** phone was pinging in the vicinity of his workplace -- United Refrigeration in Baldwin Park, California.[7] Upon learning that **PEREZ's** phone was pinging near his workplace, I went to United Refrigeration while the phone remained actively pinging in the area. Although I did not see **PEREZ**, I observed his car -- a red Buick sedan with California license plate number 7YKC754 -- parked in the United Refrigeration parking lot.[8] The fact that **PEREZ's** car was parked at his workplace led me to believe that **PEREZ** was at work at this time. Accordingly, because **PEREZ's** phone was pinging in the vicinity of **PEREZ's** workplace where I believe **PEREZ** was physically present at the time, I believe **PEREZ's** phone was

---

[7] Based on my conversations with an FBI employee providing investigative support, I understand that **PEREZ** works at United Refrigeration. I have not yet obtained records regarding **PEREZ's** employment in response to a subpoena sent to Employment Development Department ("EDD").

[8] From my review of law enforcement database queries, I know that a red Buick sedan with California license plate number 7YKC754 is registered to **PEREZ** at his previous home address in Covina.

13

likely in **PEREZ's** possession. Because the phone was likely in his possession, this suggests to me that **PEREZ** is the user of the phone.

ii. While conducting surveillance of **PEREZ** on or about February 1, 2019, I observed **PEREZ** driving the red Buick sedan registered to him. While he was driving the red Buick sedan, the GPS data for **PEREZ's** phone showed that the phone was moving in a manner consistent with **PEREZ's** physical movement in his vehicle. Based on my training and experience, this information suggests that the phone was in **PEREZ's** possession when I observed him. **PEREZ's** possession of the phone again suggests that he is the phone's user.

23. Based on my review of toll records obtained from Sprint Corporation (the carrier for **PEREZ's** phone), as well as my review of MCBRIDE's phone pursuant to the aforementioned search warrant, I know that at or around the time of the robbery **PEREZ** had contact, or attempted contact, with MCBRIDE at least nine times (six calls and three text messages). As detailed herein, **PEREZ** also had contact, or attempted contact, with **AGUILERA** and **SANFORD** at least eight times around the time of the robbery. Based on my training and experience and involvement in this investigation, the fact that **PEREZ** was in contact with three other co-conspirators during an armed robbery, particularly one occurring in the early morning hours of 3 a.m. to 5 a.m. when they would have had no other known reason to be speaking, suggests that they were communicating about the robbery and in order to facilitate it.

14

Instrumentality Protocol

24.  Furthermore, from my review of MCBRIDE's phone pursuant to the aforementioned search warrant, I know that MCBRIDE and **PEREZ** exchanged the below text messages before, during, and after the robbery. Based on my training and experience and involvement in this investigation, I believe that MCBRIDE and **PEREZ** were communicating about the robbery.

a.  On or about October 28, 2018, just one day before robbery, **PEREZ** texted MCBRIDE: "Dnt forget the shotty . Also on another note. What's cracking with the walkie talkies.  . To keep in touch with the look outs." MCBRIDE responded with a series of messages, saying: "Working on that you'll have the boom boom," "I got you black gloves tambien," "I have your jacket," and "Working on gonna go pick up the walkie talkies." One minute later, MCBRIDE wrote: "Black shirt jeans and boots or regular shoes and hat" and "I have a plain black t if you need." **PEREZ** responded, "Orale. Shoot that black T." Based on my training and experience and involvement in this investigation, I believe that MCBRIDE and **PEREZ** were communicating about the robbery, in particular discussing the items they were going to bring and/or wear to falsely portray themselves as deputy sheriffs and communicate with one another. In addition, when **PEREZ** told MCBRIDE to not forget the "shotty," based on my training and experience and involvement with this investigation, I believe that **PEREZ** was telling MCBRIDE to bring the long-gun the night of the robbery. Indeed, during the robbery, surveillance video shows **PEREZ** carrying a long-gun, similar to an assault rifle.

15

Instrumentality Protocol

b. On or about October 29, 2018, shortly before the robbery, MCBRIDE texted **PEREZ**: "Be there in 5" and "Here." Based on my training and experience and involvement in this investigation, I believe that MCBRIDE was telling **PEREZ** that he was about to arrive, and later did arrive, at a designated meeting point just prior to the robbery.

c. On or about October 29, 2018, at or around the time of the robbery, **PEREZ** sent a text message to MCBRIDE saying: "Let me know when u grab that heat. Asap." Based on my training and experience and involvement in this investigation, when **PEREZ** referred to "grab that heat," I understand that **PEREZ** was possibly telling MCBRIDE to retrieve a firearm that had been left behind at the Warehouse. From my review of surveillance video from the Warehouse, I know that when LAPD officers responded to a call for service at the Warehouse, MCBRIDE, **PEREZ**, and **AGUILERA** fled the Warehouse through a back roll-up door. **PEREZ** discarded what appeared to be a LASD jacket and other items, including possibly a firearm, in a nearby bush. A short time later, after the LAPD officers had left the Warehouse, the surveillance video shows that MCBRIDE returned to the Warehouse and retrieved the items from the bush. After MCBRIDE retrieved those items, including what may have been a firearm, he texted **PEREZ** saying, "Got it."

d. In the hours following the robbery on or about October 29, 2018, **PEREZ** sent MCBRIDE a series of text messages saying: "What ever you can. It's all appreciated. Glad we made out Carnal," "Did you grab any distilled," and "I had boxed some

16

Instrumentality Protocol

up and placed by the door." MCBRIDE responded with a series of messages, including one saying: "Yeah the call was cleared so that's all good." Minutes later, **PEREZ** texted MCBRIDE, saying "did u grab the holster." MCBRIDE responded, in part: "Got everything" and "I love you carnal I'm glad we got out and everything is straight." **PEREZ** later texted: "Love you too Carnal. Glad we all made it out. Serio." Based on my training and experience and involvement in this investigation, I believe that MCBRIDE and **PEREZ** were debriefing about the robbery. Among other things, they were discussing that the "call" (likely the LAPD call for service at the Warehouse) was "cleared" (i.e. that LAPD officers had left after mistakenly determining there was no threat at the Warehouse). When **PEREZ** asked MCBRIDE if he got the "holster," I understand that he was referencing a holster, likely with a handgun in it, worn during the robbery. Finally, when both said that they were glad to have made it "out," I understand that **PEREZ** and MCBRIDE were relieved that they had successfully completed the robbery without being apprehended by the LAPD officers who had responded to a call for service at the Warehouse.

        2.   **AGUILERA** Communicates with MCBRIDE and **PEREZ** During the Robbery to Facilitate the Heist

25. Based on my training and experience and involvement in this investigation, I believe that **AGUILERA** is the user of a cellular telephone with phone number (323) 680-2790 ("**AGUILERA's** phone") for the following reasons, among others:

17

a.    Based on my review of MCBRIDE's phone pursuant to the aforementioned search warrant, I am aware that phone number (323) 680-2790 (**AGUILERA's** phone) is saved in MCBRIDE's phone under the name "danny." **AGUILERA's** first name is "Daniel," and from my experience, I am aware that "Danny" is a common nickname for "Daniel."

b.    From my conversations with FBI special agents conducting surveillance in this investigation, I am aware that agents conducted surveillance of **AGUILERA** on or about January 25, 2019. While surveilling **AGUILERA**, the agents placed a ruse phone call to **AGUILERA's** phone and observed **AGUILERA** answer the phone. Based on my training and experience, the fact that **AGUILERA** was in possession of the phone further suggests that **AGUILERA** is the user of the phone.

c.    On December 18, 2018, in case number 18-MJ-3335, Judge Audero issued a warrant authorizing the disclosure of historical cell-site information and prospective cell-site and GPS information and the use of cell-site simulator for **AGUILERA's** phone, among others, for 45 days. On January 31, 2019, in case number 19-MJ-263, the Honorable Paul L. Abrams, United States Magistrate Judge, issued a second warrant authorizing the disclosure of the same information for **AGUILERA's** phone for another 45 days. Pursuant to these warrants, the FBI began receiving GPS information for **AGUILERA's** phone from on or about December 19, 2018 until the present. From my review of the data, I understand that **AGUILERA's** phone has pinged in the vicinity of **AGUILERA's** home (SUBJECT PREMISES

18

**Instrumentality Protocol**

2) most days, particularly at night and into the early hours of the morning. Based on my training and experience, I know that when a phone pings consistently in an area late into the night and early the following morning, that is indicative of where an individual is sleeping and thus likely residing. Because **AGUILERA's** phone is pinging consistently in the vicinity of **AGUILERA's** home (SUBJECT PREMISES 2), particularly at times when he is likely sleeping there, I believe that **AGUILERA** is in possession of the phone. His possession of the phone again corroborates my belief that he is the user.[9]

26. Based on my review of toll records obtained from T-Mobile, U.S.A., Inc. (the carrier for **AGUILERA's** phone) and review of MCBRIDE's phone pursuant to the aforementioned search warrant, I know that at or around the time of the robbery, there were at least three phone calls, or attempted phone calls, between **AGUILERA** and MCBRIDE. There were also at least seven phone calls, or attempted phone calls, between **AGUILERA** and **PEREZ** (through **PEREZ's** phone) at or around the time of the robbery. Based on my training and experience and involvement in this investigation, the fact that **AGUILERA** was communicating (or even attempting to communicate) with both MCBRIDE and **PEREZ** at or around the time of an armed robbery, particularly one occurring in the early morning hours of 3 a.m. to 5 a.m. when

---

[9] Subscriber records indicate that **AGUILERA's** phone is subscribed to Chelsea Mendoza in Montebello, California. From my training and experience, I understand that although the subscriber of a phone is often the user, that is not always the case. For the aforementioned reasons and based on my involvement in this investigation, I believe that **AGUILERA** is the phone's user.

19

they would have had no other known reason to be speaking, suggests that they were communicating about the robbery and in order to facilitate it.

 3. Cell-Site Data Confirms that **AGUILERA** Was Near
 the Warehouse During the Robbery[10]

 27. The historical cell-site data for **AGUILERA**'s phone obtained pursuant to the aforementioned warrant in case number 18-MJ-3335 further suggests that **AGUILERA** was in the vicinity of the Warehouse at or around the time of the robbery. FBI Special Agent Keith MacCalla ("SA MacCalla"), a trained and certified member the FBI Cellular Analysis Survey Team, conducted an analysis of the historical cell-site data. Based on my review of the historical cell-site data and conversations with SA MacCalla, I am aware of the following:

 a. On or about October 29, 2018, between 3:21 a.m. and 4:59 a.m., **AGUILERA's** phone had six calls, four incoming and two outgoing, that utilized, or pinged, the following three cellular towers: (1) Tower 85994; (2) Tower 87666; and (3) Tower 95778.

 b. Tower 85994 is located at or near 301 North Garey Street, Los Angeles, California 90012. The distance between Tower 85994 and the Warehouse is approximately 0.2 miles, which suggests that **AGUILERA** was likely in the vicinity of the Warehouse at the time his phone pinged this tower.

---

[10] Historical cell-site data was largely unavailable for **PEREZ's** phone during the robbery. The majority of the events listed in the records for **PEREZ's** phone indicated that call activity most often occurred via a Wi-Fi internet connection, meaning that historical cell-site location information was often unavailable.

20

Instrumentality Protocol

c. Tower 87666 is located at or near street address of 415 North Mission Road, Los Angeles, California 90033. The distance between Tower 87666 and the Warehouse is approximately 0.7 miles, which suggests that **AGUILERA** was likely in the vicinity of the Warehouse at the time his phone pinged this tower.

d. Tower 95778 is located at or near 500 North Mission Road, Los Angeles, California 90033. The distance between Tower 95778 and the Warehouse is approximately 0.7 miles, which suggests that **AGUILERA** was likely in the vicinity of the Warehouse at the time his phone pinged this tower.

28. As detailed herein, **AGUILERA** lives at 1202 Glennfield Court, Apartment 196, Los Angeles, California 90023 (SUBJECT PREMISES 2). SUBJECT PREMISES 2 is approximately 3.3 miles away from the Warehouse. Particularly given that the robbery took place between 3 a.m. and 5 a.m., I am unaware of any reason why **AGUILERA** would have been in the vicinity of the Warehouse during the early morning robbery except to participate in it.

**D. SANFORD Serves as a Nearby Look-Out During the Robbery**

29. From my review of the surveillance camera footage, I did not see **SANFORD** physically present at the Warehouse during the robbery. However, for the reasons herein and based on my training and experience, I believe that **SANFORD** served as a nearby look-out during the robbery, scouting for law enforcement or other potential threats.

21

Instrumentality Protocol

1. **SANFORD's** Cellular Phone

30. Based on my training and experience and involvement in this investigation, I believe that **SANFORD** is the user of a cellular telephone with phone number (909) 841-9456 ("**SANFORD's** phone") for the following reasons, among others:

a. Subscriber records indicate that **SANFORD's** phone is subscribed to **SANFORD** at **SANFORD's** home address (SUBJECT PREMISES 3). From my training and experience, the subscriber of a phone is often the user. Furthermore, the fact that **SANFORD's** phone is subscribed to him at his home address (SUBJECT PREMISES 3) further supports my belief that **SANFORD** is the user.

b. Based on my review of MCBRIDE's phone pursuant to the aforementioned search warrant, I am aware that phone number (909) 841-9456 (**SANFORD's** phone) is saved in MCBRIDE's phone under the name "Monte Jay." **SANFORD's** first name is "Jay." For this reason and based on my involvement in this investigation, I understand that "Monte Jay" is a nickname for **SANFORD**.

c. On or about December 19, 2018, the FBI began receiving GPS data for **SANFORD's** phone, as well as historical cell-site data dating back to August 1, 2018, pursuant to the warrant in case number 18-MJ-3335. According to SA MacCalla and from my review of the data, **SANFORD's** phone has frequently pinged in the vicinity of his home (SUBJECT PREMISES 3), notably overnight when he is likely to be home sleeping. Based on my training and experience, this overnight ping and cell-site data suggests that **SANFORD** has been the one in possession of the phone and is therefore the phone's user.

22

Instrumentality Protocol

d.     Furthermore, while conducting surveillance of **SANFORD**, I observed him driving a vehicle registered to him. While he was driving this vehicle, the GPS data for **SANFORD's** phone showed that the phone was moving in a manner consistent with **SANFORD's** physical movement in his vehicle. Based on my training and experience, this information suggests that the phone was in **SANFORD's** possession when I observed him. As such, **SANFORD's** possession of the phone again suggests that he is the phone's user.

2.     Toll Records Show That **SANFORD** Communicated with MCBRIDE and **PEREZ** Around the Time of the Robbery

31.     Based on my review of toll records obtained from T-Mobile, U.S.A., Inc. (the carrier for **SANFORD's** phone) and review of MCBRIDE's phone pursuant to the aforementioned search warrant, I know that at or around the time of the robbery, **SANFORD** had contact, or attempted contact, with MCBRIDE at least nineteen times (eight calls and 11 text messages). **SANFORD** also had contact, or attempted contact, with **PEREZ** (through **PEREZ's** phone) at least 11 times (nine calls and two text messages). Based on my training and experience and involvement in this investigation, the fact that **SANFORD** was communicating (or even attempting to communicate) with both MCBRIDE and **PEREZ** at or around the time of an armed robbery, particularly one occurring in the early morning hours of 3 a.m. to 5 a.m. when they would have had no other known reason to be speaking, suggests that they were communicating about the robbery and in order to facilitate it.

23

Instrumentality Protocol

3. Text Messages Between **SANFORD** and MCBRIDE Show that **SANFORD** Served as a Look-Out During the Robbery

32. From my review of MCBRIDE's phone pursuant to the aforementioned search warrant, I know that MCBRIDE and **SANFORD** exchanged the below text messages. Based on my training and experience and involvement in this investigation, I believe that the below text messages relate the robbery and show that **SANFORD** served as a look-out during it.

a. On or about October 28, 2018, **PEREZ** texted MCBRIDE: "Dnt forget the shotty. Also on another note. What's cracking with the walkie talkies. To keep in touch with the look outs." From this text message, I understand that MCBRIDE and/or other co-conspirators planned to keep in touch with multiple nearby look-outs during the robbery through walkie-talkie radios. Based on my training and experience, I am aware that it is common for look-outs to scout for law enforcement or other threats during a robbery; look-outs are valuable to warn individuals committing the robbery about any approaching threats so that those individuals can act accordingly, for instance to avoid detection by law enforcement.

b. On or about October 29, 2018, at or around the time of the robbery, MCBRIDE texted **SANFORD**, telling him to "[t]urn on radio." **SANFORD** responded, "It is on I could hear you can you hear me." Based on my training and experience and involvement in this investigation, I believe that **SANFORD** was serving as a nearby look-out during the robbery and that he and MCBRIDE were attempting to communicate via walkie-talkie radios.

24

Instrumentality Protocol

c.    In addition, on or about October 29, 2018,
MCBRIDE texted **SANFORD** the address of the Warehouse and said
"[t]hat's the address of the place."  MCBRIDE also texted
**SANFORD**, telling him to "find a spot to park and post up."
**SANFORD** responded, "I'm looking."  Based on my training and
experience and involvement in this investigation, I believe that
MCBRIDE texted **SANFORD** the address of the Warehouse so that
**SANFORD** could park nearby and "post up," meaning to serve as a
look-out during the robbery.

          4.    Cell-Site Data Corroborates That **SANFORD**
                Was Near the Warehouse During the Robbery

33.    The historical cell-site data for **SANFORD**'s phone
obtained pursuant to the aforementioned warrant in case number
18-MJ-3335 further suggests that **SANFORD** was near the Warehouse
during the robbery.  Based on my review of the historical cell-
site data and conversations with SA MacCalla, I am aware of the
following:

a.    On or about October 29, 2018, between 3:46 a.m.
and 4:07 a.m., **SANFORD's** phone had 10 calls, nine incoming and
one outgoing, with **PEREZ** or MCBRIDE that utilized, or pinged,
the following six cellular towers: (1) Tower 88579; (2) Tower
85994; (3) Tower 85940; (4) Tower 87666; (5) Tower 80606; and
(6) Tower 84206.

b.    Tower 88579 is located at or near 620 East
Commercial Street, Los Angeles, California 90012.  The distance
between Tower 88579 and the Warehouse is approximately 500 feet,

25

**Instrumentality Protocol**

which suggests that **SANFORD** was likely in the vicinity of the Warehouse at the time his phone pinged this tower.

c. Tower 85994 is located at or near 301 North Garey Street, Los Angeles, California 90012. The distance between Tower 85994 and the Warehouse is approximately 0.2 miles, which suggests that **SANFORD** was likely in the vicinity of the Warehouse at the time his phone pinged this tower. (As noted above, **AGUILERA's** phone also pinged Tower 85994 during the robbery.)

d. Tower 85940 is located at or near 701 North Main Street, Los Angeles, California 90012. The distance between Tower 85940 and the Warehouse is approximately 0.7 miles, which suggests that **SANFORD** was likely in the vicinity of the Warehouse at the time his phone pinged this tower.

e. Tower 87666 is located at or near 415 North Mission Road, Los Angeles, California 90033. The distance between Tower 87666 and the Warehouse is approximately 0.7 miles, which suggests that **SANFORD** was likely in the vicinity of the Warehouse at the time his phone pinged this tower. (As noted above, **AGUILERA's** phone also pinged Tower 87666 during the robbery.)

f. Tower 80606 is located at or near 300 Avery Street, Los Angeles, California 90013. The distance between Tower 80606 and the Warehouse is approximately 0.9 miles, which suggests that **SANFORD** was likely in the vicinity of the Warehouse at the time his phone pinged this tower.

26

**Instrumentality Protocol**

g. Tower 84206 is located at or near 200 San Pedro Street, Los Angeles, California 90012. The distance between Tower 84206 and the Warehouse is approximately 0.9 miles, which suggests that **SANFORD** was likely in the vicinity of the Warehouse at the time his phone pinged this tower.

34. As detailed herein, **SANFORD** lives at 939 North Gordon Street, Pomona, California 91768 (SUBJECT PREMISES 3). SUBJECT PREMISES 3 is approximately 29 miles away from the Warehouse. Particularly given that the robbery took place between 3 a.m. and 5 a.m., I am unaware of any reason why **SANFORD** would have been in the vicinity of the Warehouse during the early morning robbery except to participate in it.

> 5. Surveillance Video Captures a Vehicle Resembling **SANFORD's** Truck Near the Warehouse During the Robbery

35. From my close and repeated review of the surveillance camera footage of the Warehouse robbery, I know that a green older model Chevrolet pick-up truck drove by the rear of the Warehouse at approximately 3:11 a.m. during the robbery.

36. Based on my review of California Department of Motor Vehicles ("DMV") records, I know that a green 1997 Chevrolet pick-up truck with California license plate number 12669E1 is registered to **SANFORD** at his residence (SUBJECT PREMISES 3). While conducting surveillance of **SANFORD**, I have seen **SANFORD** driving his green Chevrolet truck. I have also seen **SANFORD's** green Chevrolet truck parked at his residence (SUBJECT PREMISES 3).

27

**Instrumentality Protocol**

37. Based on my training and experience and involvement in this investigation, I believe that **SANFORD** likely drove his green Chevrolet truck by the Warehouse shortly after the robbery commenced as part of his role as a look-out. Part of a look-out's responsibilities during any criminal activity is to scout for law enforcement or other potential threats. Driving near the scene of a crime would be consistent with **SANFORD** serving as a look-out during the robbery.

### E. MCBRIDE Tells ANTRIM That He Is Going to Pay PEREZ, AGUILERA, and SANFORD for Their Help With the Robbery

38. From my review of MCBRIDE's phone pursuant to the aforementioned search warrant, I am aware that on or about November 3, 2018, just five days after the robbery, MCBRIDE texted ANTRIM. MCBRIDE said, "Sorry my exact total was 245,800 and some change lol." MCBRIDE then said, "I'm giving Neer 30 Monte jay 10 and Daniel 5." Based on my training and experience and involvement with this investigation, I understand that MCBRIDE was telling ANTRIM that he netted approximately $245,800 from the robbery and intended to pay **PEREZ** ("Neer") $30,000, **SANFORD** ("Monte jay") $10,000, and **AGUILERA** ("Danny") $5,000 for their assistance with the robbery.

### F. The SUBJECT PREMISES and DEVICES

39. SUBJECT PREMISES 1. SUBJECT PREMISES 1 is the premises located at 1132 West Philadelphia Street, Ontario, California 91762, as described in Attachment A-1. For the following reasons, among others, I believe that **PEREZ** recently

28

Instrumentality Protocol

relocated to SUBJECT PREMISES 1 on or about January 27, 2019 and is currently residing there:

a.     On or about December 19, 2018, the FBI began receiving GPS data for **PEREZ's** phone pursuant to a warrant in case number 18-MJ-3335.  From my review of the GPS data, I am aware that **PEREZ's** phone frequently pinged in the vicinity of 321 South Albertson Avenue, Covina, California 91723, from on or about December 19, 2018 through on or about January 26, 2019. (From my review of California DMV records, I am aware that this Covina address is listed as **PEREZ's** home address and that **PEREZ** has at least one vehicle registered to him at this address.) The GPS data shows that from on or about December 19, 2018, through on or about January 26, 2019, **PEREZ's** phone frequently pinged in the vicinity of the Covina address late into the evening and early the following morning.  Based on my training and experience, this overnight ping pattern suggests that **PEREZ** was spending the night at this residence in Covina, and thus was likely living there, up until January 26, 2019.

b.     However, from my review of the GPS ping data, I am aware that beginning on or about January 27, 2019, the overnight ping pattern for **PEREZ's** phone changed.  Beginning on or about January 27, 2019, and continuing until the present, **PEREZ's** phone has been frequently pinging in the vicinity of SUBJECT PREMISES 1, including late into the evening and early the following morning.  Based on my training and experience, I believe this overnight ping pattern is consistent with **PEREZ**

29

**Instrumentality Protocol**

spending the night, and therefore now likely residing, at SUBJECT PREMISES 1.

        c.    Surveillance that I conducted of **PEREZ** further supports my belief that **PEREZ** recently relocated from his prior residence in Covina to SUBJECT PREMISES 1 on or about January 27, 2019.

        i.    On or about February 1, 2019, I conducted surveillance of **PEREZ** at SUBJECT PREMISES 1. I observed **PEREZ's** red Buick sedan with California license plate number 7YKC754 parked on West Philadelphia Street near SUBJECT PREMISES 1 at approximately 5:55 a.m. At approximately 6:53 a.m., I saw **PEREZ** leave SUBJECT PREMISES 1, walk to his red Buick sedan, and drive to United Refrigeration in Baldwin Park, where he works.

        ii.    On or about February 7, 2019, I saw **PEREZ** leave SUBJECT PREMISES 1 at approximately 6:49 a.m. Upon leaving, he turned back toward the front door and appeared to close and lock the door. He then walked down a flight of stairs to the first floor (the front door is on the second story) and unlocked a side door to the garage for SUBJECT PREMISES 1. Shortly thereafter, **PEREZ** left SUBJECT PREMISES 1 in his red Buick sedan.

        iii. Based on my training and experience, my surveillance of **PEREZ** suggests that he is currently residing at SUBJECT PREMISES 1. Among other things, he appears to be

30

Instrumentality Protocol

spending the night there and has a key with access to the premises.[11]

40. SUBJECT PREMISES 2. SUBJECT PREMISES 2 is the premises located at 1202 Glennfield Court, Apartment 196, Los Angeles, California 90023, as described in Attachment A-2. I believe that **AGUILERA** resides at SUBJECT PREMISES 2 for the following reasons, among others:

a. According to California DMV records, SUBJECT PREMISES 2 is **AGUILERA's** home address.

b. California DMV records also show at least one vehicle registered to **AGUILERA** at SUBJECT PREMISES 2. Based on my training and experience, I am aware that individuals often register vehicles to their home address or an address they frequent.

c. According to SA MacCalla, historical cell-site data for **AGUILERA's** phone obtained pursuant to the warrant in case number 18-MJ-3335 indicates that between August 1, 2018, and December 18, 2018, the most frequently used cellular tower was Tower 98866. Tower 98866 is located at or near 1181 South Concord Street, Los Angeles, California 90023. Tower 98866 is less than 250 feet from SUBJECT PREMISES 2. Based on my

---

[11] From my involvement in this investigation, I understand that the utilities for SUBJECT PREMISES 1 are not currently in **PEREZ's** name. Based on my training and experience, I understand that the utilities for an apartment are not always in the name of the property's occupant, particularly where the occupant is a renter and/or just recently relocated to the property. In addition, I understand that individuals do not always notify DMV to update their home address or vehicle registration address immediately upon moving. Based on the GPS data for **PEREZ's** phone, combined with my physical surveillance of him, I believe that **PEREZ** is currently residing at SUBJECT PREMISES 1.

31

Instrumentality Protocol

training and experience, I believe this data is consistent with **AGUILERA** residing at SUBJECT PREMISES 2.

d. On or about December 19, 2018, the FBI began receiving GPS data for **AGUILERA's** phone pursuant to the warrant in case number 18-MJ-3335. From my review of the data, **AGUILERA's** phone has frequently pinged in the vicinity of SUBJECT PREMISES 2 in the evenings and early the next morning. Based on my training and experience, that overnight ping pattern is consistent with **AGUILERA** residing at SUBJECT PREMISES 2, because it suggests that **AGUILERA** is spending the night there.

41. SUBJECT PREMISES 3. SUBJECT PREMISES 3 is the premises located at 939 North Gordon Street, Pomona, California 91768, as described in Attachment A-3. I believe that **SANFORD** resides at SUBJECT PREMISES 3 for the following reasons, among others:

a. According to California DMV records, SUBJECT PREMISES 3 is **SANFORD's** home address.

b. California DMV records also show at least one vehicle (**SANFORD's** green Chevrolet truck) registered to **SANFORD** at SUBJECT PREMISES 3. As stated, based on my training and experience, I am aware that individuals often register vehicles to their home address or an address they frequent. This is supported by the fact that, while conducting surveillance of **SANFORD**, I have seen **SANFORD's** truck parked at SUBJECT PREMISES 3. I have also observed **SANFORD** driving his truck to SUBJECT PREMISES 3.

32

Instrumentality Protocol

c. According to SA MacCalla, the preliminary analysis of historical cell-site data for **SANFORD's** phone obtained pursuant to a warrant in case number 18-MJ-3335 indicates that between August 1, 2018, and December 18, 2018, the most frequently used cellular tower was Tower 88391. Tower 88391 is located at or near 209 West Pearl Street, Pomona, California 91768. Tower 88391 is approximately 0.2 miles from SUBJECT PREMISES 3. Based on my training and experience, I believe this data is consistent with **SANFORD** residing at SUBJECT PREMISES 3.

d. On or about December 19, 2018, the FBI began receiving GPS data for **SANFORD's** phone pursuant to the warrant in case number 18-MJ-3335. From my review of the data, **SANFORD's** phone frequently pinged in the vicinity of SUBJECT PREMISES 3 in the evenings and early the next morning. Based on my training and experience, that overnight ping pattern is consistent with **SANFORD** residing at SUBJECT PREMISES 3.

42. SUBJECT DEVICE 1. SUBJECT DEVICE 1 refers to any digital device, including but not limited to a cellular telephone, in the possession, custody, or control of **PEREZ** at the time of his arrest, as described in Attachment A-4.

43. SUBJECT DEVICE 2. SUBJECT DEVICE 2 refers to any digital device, including but not limited to a cellular telephone, in the possession, custody, or control of **AGUILERA** at the time of his arrest, as described in Attachment A-5.

44. SUBJECT DEVICE 3. SUBJECT DEVICE 3 refers to any digital device, including but not limited to a cellular

33

Instrumentality Protocol

telephone, in the possession, custody, or control of **SANFORD** at the time of his arrest, as described in Attachment A-6.

## VII. TRAINING AND EXPERIENCE REGARDING THE SUBJECT OFFENSES

45. Based on my training and experience and conversations with agents and other law enforcement officers trained and experienced in narcotics investigations, I am familiar with the methods and modes of operation typically used by individuals trafficking in controlled substances. Based on conversations with other law enforcement officers and my knowledge of this investigation and others, I am aware of the following:

a. Individuals involved in the illegal distribution of controlled substances, or who possess controlled substances with the intent to distribute to controlled substances, will frequently keep records, documents, United States currency derived from their criminal conduct, and other evidence pertinent to their drug trafficking activities at their residence and areas associated with their residence. They often conceal evidence of their drug trafficking in their residences, as well as garages, carports, storage facilities, lockers, outbuildings, and other surrounding areas to which they have ready access. Further, I know from my conversations with Assistant United States Attorney Lindsey Greer Dotson ("AUSA Dotson") that the case law in the Ninth Circuit establishes a general presumption that individuals involved in drug

34

Instrumentality Protocol

trafficking maintain evidence of their criminal activities in their residences.[12]

b.      Drug traffickers, including individuals who assist drug traffickers, will often conceal controlled substances, proceeds of their illegal activity, and weapons in hidden compartments or manufactured spaces, including within the walls of their residences and garages, within furniture contained in their residences, and in compartments in their vehicles.

c.      The distribution of drugs is generally a continuing criminal activity taking place indefinitely unless interrupted by law enforcement action. Drug traffickers typically will obtain and distribute controlled substances on a regular basis, much as any distributor of a legitimate commodity would purchase stock for sale. Such traffickers will have an "inventory" which will fluctuate in size depending on the demand for the product.

d.      Drug traffickers begin distributing small quantities of controlled substances. As they develop their

_____

[12]  AUSA Dotson provided me the following case citations: "In the case of drug dealers, evidence is likely to be found where the dealers live." United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986) (citations omitted). "[E]vidence discovered by [] officers linking the defendant to a drug scheme provide[s] 'more than a sufficient showing for obtaining the warrant to search [their]...residence.'" United States v. Fannin, 817 F.2d 1379, 1382 (9th Cir. 1987) (quotation and citation omitted). An unpublished decision refers to this common-sense principle as the "residency presumption." United States. v. Crowell, 1993 WL 493743, *2 (9th Cir. 1993) (unpublished).

35

customer base and their supply contacts, they are able to deal in larger quantities. Those who are trafficking in distribution quantities of controlled substances, i.e. quantities significantly beyond those which are used for personal or recreational use (as is the case here), are not new to the business; rather, they have usually established their supply contacts and customers over months or years and are likely to have records of their past business, contacts, and customers in their residence.

e. Drug traffickers commonly use certain paraphernalia to package and prepare controlled substances for distribution, such as plastic baggies, latex gloves, scales and other weighing devices, measuring devices, strainers, compression devices, etc.

f. Drug traffickers, including individuals who assist drug traffickers, often have in their possession, including at their residence, firearms -- including handguns, pistols, revolvers, rifles, shotguns, machine guns, and/or other weapons, as well as ammunition and ammunition components -- that are used to protect and secure the drug traffickers' property. In addition, as was the case here, firearms are often used to facilitate the theft of controlled substances and cash.

g. Drug traffickers, including individuals who assist drug traffickers, often have in their possession large amounts of cash from their criminal endeavors. Drug traffickers generally sell controlled substances for cash. Because drug traffickers generally sell controlled substances for cash, they

36

Instrumentality Protocol

typically have significant amounts of cash on hand, as proceeds of sales and to purchase their own supplies. In addition, drug traffickers and those who assist drug traffickers often have other assets generated by their criminal conduct or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables. They often keep these items, and records reflecting their purchase or sale, such as automobile titles or deeds to property, as well as evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money acquired from engaging in drug trafficking activities, in their residences, offices, garages, storage buildings, lockers, automobiles, and safe deposit boxes.

h. Drug traffickers, including individuals who assist drug traffickers, often attempt to conceal the proceeds of their criminal activity through money laundering transactions to make it appear as though the proceeds were derived from a legitimate source.

i. Drug traffickers, including individuals who assist drug traffickers, often communicate with co-conspirators using coded or vague language to thwart the detection of law enforcement. Therefore, documents, notes, communications, or other records evidencing criminal conduct may be in coded or vague language.

j. Drug traffickers, including individuals who assist drug traffickers, often use one or more telephones, pagers, or other digital devices to negotiate times, places,

37

Instrumentality Protocol

schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances, and for arranging transport and security of the same as well as for the disposition of proceeds from the sale of controlled substances.

k. Furthermore, I know that professional drug trafficking operations depend upon maintaining both long-distance and local contacts with both suppliers and those down the organizational chain to the local traffickers. They often use fraudulent information to subscribe to communication facilities, especially cellular telephones, maintain separate customer and supplier telephones, and frequently change communications facilities to thwart law enforcement efforts to intercept their communications. They frequently use pre-paid telephones and/or false or misleading subscriber information as a way of distancing themselves from criminal liability.

l. Data contained on digital devices used by drug traffickers and their co-conspirators often includes, among other things, records of telephone calls, text messages, and e-mail communications between the trafficker and the co-conspirators; Global Positioning System ("GPS") information and other location information that can help identify stash locations, meeting places, and trafficking routes; and identifying information about the trafficker and co-conspirators, such as contact lists, calendar appointments, and photographs or videos.

m. Drug traffickers, including individuals who assist drug traffickers, often maintain in their residences

38

**Instrumentality Protocol**

documents relating to their communication devices, in the form of receipts, bills, telephone and address books, and other books and papers that reflect, among other things, the names, addresses, and/or telephone numbers of their customers, co-conspirators, and associates in the drug trafficking organization.

n. Drug traffickers commonly provide controlled substances to trusted distributors in their organization on credit and commonly obtain controlled substances from their suppliers on credit. Therefore, I am aware that drug traffickers maintain books, records, customer lists, receipts, notes, ledgers, and other papers relating to the transportation, receipt, ordering, sales, and distribution of narcotics, narcotics proceeds, and equipment, and that such documents may be in code to attempt to thwart law enforcement detection.

o. Drug traffickers, including individuals who assist drug traffickers, keep records of their illegal activities for a period of time extending beyond the time during which they actually possesses particular controlled substances, in order to maintain contact with criminal associates for future transactions, and to have records of prior transactions for which they might still be owed payment or might owe someone else money.

p. Drug traffickers, including individuals who assist drug traffickers, generally continue their criminal activity for extensive periods of time, ordinarily indefinitely. Indeed, individuals who have established an income based on drug

39

Instrumentality Protocol

sales or distribution tend to continue the activity for prolonged periods of time because that is how they make or supplement their living and maintain the lifestyle to which they have become accustomed.

## VIII.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[13]

46.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

---

[13] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

40

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

41

Instrumentality Protocol

47. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

48. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or

42

Instrumentality Protocol

eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress **PEREZ's**, **AGUILERA's**, and/or **SANFORD's** thumb and/or fingers on the device(s); and (2) hold the device(s) in front of their face(s) with their eyes open to activate the facial-, iris-, and/or retina-recognition feature.

49. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

43

Instrumentality Protocol

## IX. REQUEST FOR NIGHTTIME SERVICE

50. Based on my training and experience, I believe there is good cause for the Court to permit law enforcement officers to execute the warrants at night. The ability to serve the requested warrants at night will provide law enforcement with a better opportunity to enter the SUBJECT PREMISES without incident to ensure everyone's safety.

51. For the following reasons, among others, I believe that **PEREZ** is likely to be armed and a risk to officer safety at the time law enforcement officers attempt to execute the search of his residence (SUBJECT PREMISES 1). As detailed above, during the robbery, **PEREZ** appeared to be armed with at least two firearms. One of those firearms was a long-gun, similar to an assault rifle. I also know from my review of MCBRIDE's phone pursuant to the aforementioned search warrant that **PEREZ** has texted MCBRIDE pictures of numerous firearms, further suggesting that **PEREZ** is likely to be armed. From my training and experience and conversations with other law enforcement officers, I know it is imperative for officer safety that officers be able to execute a search warrant of a high-risk target at a time of their choosing in order to catch the target by surprise. Among other things, the element of surprise makes it less likely that a target will have the time and ability to harm law enforcement officers executing the warrant, barricade himself, or alert other co-conspirators about the presence of law enforcement.

44

Instrumentality Protocol

52. Based on my training and experience and involvement in this investigation, I also believe that **AGUILERA** and **SANFORD** are likely to be armed given their involvement in an armed robbery and drug trafficking conspiracy. Beyond that, it is important for officer safety that law enforcement officers be able, where possible, to execute search warrants in a coordinated manner at the same time; otherwise, targets or their associates can alert other targets that law enforcement officers are en route, thereby enabling those other targets to prepare for the arrival of law enforcement, barricade themselves, and destroy evidence, among other things. Accordingly, given the risks presented by **PEREZ** and the necessity for nighttime service for the search of his residence, nighttime service is also appropriate for the remaining searches.

## X. REQUEST FOR NO-KNOCK ENTRY

53. Based on my training, experience, involvement in this investigation, and conversations with other law enforcement officers familiar with the circumstances of this particular investigation, I have a reasonable suspicion to believe that knocking and announcing law enforcement's presence at SUBJECT PREMISES 1 (**PEREZ's** residence) prior to executing the warrant would be dangerous and would inhibit the effective investigation of the Subject Offenses by allowing for the destruction of evidence.[14]

---

[14] See Richards v. Wisconsin, 520 U.S. 385, 395 (1997) ("In order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their

45

Instrumentality Protocol

54. Based on my training and experience, I know that drug traffickers use firearms and oftentimes have firearms readily accessible, even while sleeping, so that they can protect themselves, their money, and narcotics from rival traffickers and/or law enforcement. In fact, based on his text messages with MCBRIDE and the weapons he brandished during the robbery, **PEREZ** likely has a cache of weapons, including at least one assault rifle, in his possession. No-knock authorization will provide law enforcement officers in this case with the opportunity to enter SUBJECT PREMISES 1 while **PEREZ** and any other occupant(s) are sleeping, which will mitigate the concern that the occupants will access firearms or other weapons. Alternatively, knocking and announcing will provide time for **PEREZ** and any other occupant(s) to arm themselves and/or quickly destroy evidence. Accordingly, I respectfully submit that there is reasonable suspicion to authorize no-knock entry for SUBJECT PREMISES 1.

## XI. CONCLUSION

55. Based on the foregoing, I respectfully submit that there is probable cause to believe that **PEREZ, AGUILERA, SANFORD**, and others known and unknown, engaged in a Conspiracy

---

presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence. This standard -- as opposed to a probable-cause requirement -- strikes the appropriate balance between the legitimate law enforcement concerns at issue in the execution of search warrants and the individual privacy interests affected by no-knock entries.").

46

Instrumentality Protocol

to Distribute Controlled Substances, in violation of 21 U.S.C.
§ 846.

56.  Furthermore, there is probable cause to believe that
the items listed in Attachment B, which constitute evidence,
fruits, and instrumentalities of violations of the Subject
Offenses, will be found at or in the SUBJECT PREMISES and
DEVICES, as described in Attachments A-1 through A-6.

/s/

LANARD D. TAYLOR
Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before
me this  19  day of February,
2019.

UNITED STATES MAGISTRATE JUDGE

47

Instrumentality Protocol

**ATTACHMENT A-1**

**PREMISES TO BE SEARCHED**

The premises located at 1132 West Philadelphia Street, Ontario, California 91762 ("SUBJECT PREMISES 1"). SUBJECT PREMISES 1 is a two-story residence, located on the north side of West Philadelphia Street. The exterior of the residence is tan, with a brown roof and brown trim. The number "1132" is affixed to the west side of the residence. Wooden stairs lead to the front door, which is on the second level of the premises. The front door is secured by a dark-colored, aluminum security door facing west. The living area of the structure is on the second level, and a vehicle garage is on the first level. The number "1132" is affixed to the front of the garage, which faces north. SUBJECT PREMISES 1 includes any and all vehicles, storage facilities, outbuildings, and garages within the curtilage of the premises.

**ATTACHMENT A-2**

**PREMISES TO BE SEARCHED**

The premises located at 1202 Glennfield Court, Apartment 196, Los Angeles, California 90023 ("SUBJECT PREMISES 2"). SUBJECT PREMISES 2 is located within a two-story, tan apartment complex located on the north-east side of Glennfield Court. Glennfield Court is a pedestrian walkway between East 8th Street and Estrada Street. The front door to SUBJECT PREMISES 2 is located on the north-east side of Glennfield Court. The front door is on the first floor of the apartment complex and is white in color. A sign adjacent to the front door says "196." SUBJECT PREMISES 2 includes any and all vehicles, storage facilities, outbuildings, and garages within the curtilage of the premises.

## ATTACHMENT A-3

### PREMISES TO BE SEARCHED

The premises located at 939 North Gordon Street, Pomona, California 91768 ("SUBJECT PREMISES 3").  SUBJECT PREMISES 3 is a single-story residence located on the west side of Gordon Street.  The exterior of the residence is light blue or green in color with the numbers "939" affixed to the front of the residence.  The residence has a brown tile roof.  The residence is enclosed by a chain-link fence and a driveway on the north side of the premises.  SUBJECT PREMISES 3 includes any and all vehicles, storage facilities, outbuildings, and garages within the curtilage of the premises.

## ATTACHMENT A-4

### DEVICES TO BE SEARCHED

Any digital device, including but not limited to a cellular telephone, in the possession, custody, or control of MATTHEW JAMES PEREZ, also known as "Neer," date of birth July 18, 1976, at the time of his arrest ("SUBJECT DEVICE 1").

## ATTACHMENT A-5

### DEVICES TO BE SEARCHED

Any digital device, including but not limited to a cellular telephone, in the possession, custody, or control of DANIEL AGUILERA, date of birth January 9, 1988, at the time of his arrest ("SUBJECT DEVICE 2").

**ATTACHMENT A-6**

**DEVICES TO BE SEARCHED**

Any digital device, including but not limited to a cellular telephone, in the possession, custody, or control of JAY COLBY SANFORD, also known as "Monte Jay," date of birth November 4, 1977, at the time of his arrest ("SUBJECT DEVICE 3").

**ATTACHMENT B**

## I.   ITEMS TO BE SEIZED

1.   The items to be seized are the fruits, instrumentalities, and evidence of violations of 21 U.S.C. § 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances), 21 U.S.C. § 841(a)(1) (Distribution and Possession with Intent to Distribute Controlled Substances), 18 U.S.C. § 241 (Conspiracy Against Rights), 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law), 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 922(g)(1) (Possession of a Firearm or Ammunition by a Prohibited Person), 18 U.S.C. § 924(c) (Carrying or Using a Firearm in Furtherance of a Drug Trafficking Crime), 18 U.S.C. § 1956 (Money Laundering), and 18 U.S.C. § 1957 (Money Laundering in Property from Specified Unlawful Activity) (collectively, the "Subject Offenses"):

a.   Any controlled substance, including but not limited to marijuana;

b.   Any items or paraphernalia used for manufacturing, distributing, packaging, and/or weighing controlled substances, including, but not limited to: plastic baggies, scales, and other weighing devices;

c.   Any items used in the packaging of currency for consolidation and transportation, including, but not limited to: money-counting machines, money wrappers, rubber bands, duct tape or wrapping tape, plastic wrap, and plastic sealing machines;

i

Instrumentality Protocol

d. Any records, documents, programs, applications, or materials showing payment, receipt, concealment, transfer, or movement of money generated from the sale or distribution of marijuana or other controlled substances, including but not limited to: bank account records, wire transfer records, bank statements, pay-owe sheets, receipts, safe deposit box keys and records, money containers, financial records, and notes, including documents written in vague or coded language;

e. Any drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed;

f. Jackets or other clothing with the word "sheriff" or other law enforcement identifiers;

g. Law enforcement duty belt and related equipment, including but not limited to: handcuffs, batons, flashlight, gloves, and radio;

h. Records or documents purporting to be, or relating to, search warrants;

i. One black safe that is approximately five feet tall and two feet deep and has a digital combination keypad, white lettering above the keypad, one chrome handle with approximately three spokes, and hinges on the right side of the safe when facing the front of the safe;

ii

Instrumentality Protocol

j.     One black safe that is approximately five feet
tall and four feet deep and has one chrome handle with
approximately five spokes;

k.     Any United States currency over $1,000 or bearer
instruments worth over $1,000 (including cashier's checks and
traveler's checks);

l.     Any records, documents, programs, applications,
or materials reflecting the purchase or lease of real estate,
vehicles, precious metals, jewelry, or other valuable items;

m.     Any records, documents, programs, applications,
or materials reflecting the names, addresses, telephone numbers,
or communications of members or associates involved in drug
trafficking activities scheme, including but not limited to:
personal telephone books, address books, telephone bills,
photographs, videotapes, facsimiles, personal notes, receipts,
and documents;

n.     Any weapons, including but not limited to:
knives, firearms (including pistols, handguns, shotguns, rifles,
assault weapons, and machine guns), magazines used to hold
ammunition, silencers, and components of firearms (including
components or tools which can be used to modify firearms or
ammunition);

o.     Any indicia of occupancy, residency, rental, or
ownership of the SUBJECT PREMISES or DEVICES and things
described in the warrant, including, but not limited to: forms
of personal identification, records relating to utility bills,
telephone bills, loan payment receipts, rent receipts, trust

iii

deeds, lease or rental agreements, addressed envelopes, escrow documents, keys, letters, mail, canceled mail envelopes, or clothing;

        p.    Any documents or records referencing or relating to storage units or the rental of trucks or other vehicles used to commit the Subject Offenses; and

        q.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

        r.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

        i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

        ii.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

iv

Instrumentality Protocol

v.    evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys,
and other access devices that may be necessary to access the
device;

vii.  applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

viii. records of or information about Internet
Protocol addresses used by the device; and

ix.   records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

7.    As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

8.    As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony

v

Instrumentality Protocol

PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II. SEARCH PROCEDURE FOR DIGITAL DEVICES

9. In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a. Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

vi

Instrumentality Protocol

i.     The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.   The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.     If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.     If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

vii

Instrumentality Protocol

e. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g. The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

10. In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

Instrumentality Protocol

a. Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b. Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c. Any magnetic, electronic, or optical storage device capable of storing digital data;

d. Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e. Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f. Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g. Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

11. During the execution of this search warrant, law enforcement is permitted to: (1) depress the thumbs or fingers of MATTHEW JAMES PEREZ, also known as "Neer" ("PEREZ"), DANIEL AGUILERA ("AGUILERA"), and JAY COLBY SANFORD, also known as "Monte Jay" ("SANFORD") onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and

ix

Instrumentality Protocol

(2) hold the device in front of the faces of PEREZ, AGUILERA, and/or SANFORD with their eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

12. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

x

Instrumentality Protocol

# EXHIBIT 1

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the Central District of California

UNITED STATES OF AMERICA,

        Plaintiff,

      v.

KEVIN MCBRIDE,

        Defendant.

Case No.

CLERK U S

NOV - 9 2018

CENTRAL DISTRICT OF CALIF...

**MJ 18 - 2999**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning on a date unknown, and continuing until at least the date of this complaint, in Los Angeles County,

within the Central District of California, and elsewhere, defendant KEVIN MCBRIDE, MARC ANTRIM,

ERIC RODRIGUEZ, also known as "Rooster," and others known and unknown conspired and agreed with one

another to knowingly and intentionally distribute controlled substances, in violation of the following:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to Distribute Controlled Substances |

This criminal complaint is based on these facts:  Please see attached affidavit.

☒ Continued on the attached sheet.

                             /S/
                         *Complainant's signature*

               Andrew Truong, DEA Special Agent
                    *Printed name and title*

Sworn to before me and signed in my presence.

Date:      NOV - 9 2018

           **ALKA SAGAR**

                     *Judge's signature*

City and state:  Los Angeles, California

          United States Magistrate Judge
                   *Printed name and title*
                    **ALKA SAGAR**

LGD
AUSAs: Lindsey Dotson (x4443), Joseph Axelrad (x7964)

## Table of Contents

I.    INTRODUCTION ........................................... 1

II.   PURPOSE OF AFFIDAVIT ................................... 2

III.  STATEMENT OF PROBABLE CAUSE ........................... 3

      A.   Background ....................................... 3

      B.   Surveillance Video Shows MCBRIDE Robbing
           the Warehouse with ANTRIM, While Armed and
           Purporting to be a Deputy ....................... 4

      C.   MCBRIDE Calls ANTRIM During the Robbery ......... 5

      D.   After the Robbery, the Penske Truck Carrying
           the Stolen Marijuana and Safes Goes to
           MCBRIDE's House ................................. 7

      E.   Agents Recover $150,000 to $200,000 in Cash,
           a Loaded Firearm, and Other Evidence from
           MCBRIDE's House ................................. 8

      F.   Agents Recover $150,000 to $200,000 in Cash,
           Four Firearms, and Other Evidence from
           ANTRIM's House .................................. 9

IV.   Training and Experience Regarding Distribution
      Quantities of Marijuana and Possession of Firearms .. 10

V.    CONCLUSION ............................................ 11

**AFFIDAVIT**

I, ANDREW TRUONG, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA") and have been so employed since April 2015. I am currently assigned to the DEA's Los Angeles Field Division, High Intensity Drug Trafficking Area Group 48 ("HIDTA 48"), investigating large-scale drug trafficking organizations operating in the Southern California area and elsewhere.

2. I received 640 hours of narcotics law enforcement training at the DEA Basic Agent Training at the DEA Academy, Quantico, Virginia. Through the DEA Academy and continuing education, I have received extensive training on conducting federal narcotics investigations, investigative techniques, running undercover operations, interviewing witnesses and subjects, developing sources, and search and seizure of evidence, among other things.

3. Based on my training, experience, and conversations with other narcotics investigators, I am familiar with drug traffickers' methods of operation including the distribution, storage, and transportation of drugs, as well as the collection of drug proceeds and methods of money laundering used to conceal the nature of the proceeds. I have received training and collaborated with other law enforcement officers regarding the unlawful importation, possession, and distribution of controlled

1

substances. Based on my experience and work with other law enforcement agents, I am familiar with public corruption statutes and money laundering statutes involving the proceeds of specified unlawful activities and conspiracies associated with criminal narcotics, in violation of Titles 18 and 21 of the United States Code. I also speak regularly with narcotics investigators at the federal, state, and local level, as well as drug traffickers and informants, regarding the manner in which drug traffickers store, sell, and transport narcotics.

4.    Prior to joining DEA, I was an Investigative Specialist with the Federal Bureau of Investigation ("FBI") in Los Angeles, California from September 2012 to April 2015. During my tenure with the FBI, I conducted surveillance operations and provided investigative support.

## II.    PURPOSE OF AFFIDAVIT

5.    This affidavit is made in support of a criminal complaint against, and arrest warrant for, **KEVIN MCBRIDE** (**"MCBRIDE"**) for Conspiracy to Distribute Controlled Substances, in violation of 21 U.S.C. § 846.

6.    The facts set forth in this affidavit are based upon my training and experience, review of recordings, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant. It does not purport to set forth all of my knowledge of, or investigation into, this matter. Unless specifically indicated otherwise, all conversations and

2

statements described in this affidavit are related in substance and in part only.

### III. **STATEMENT OF PROBABLE CAUSE**

**A.    Background**

7.    On November 7, 2018, I swore out an affidavit in support of a criminal complaint in United States v. Marc Antrim and Eric Rodriguez, case no. 18-MJ-2983, before the Honorable Edward M. Infante, United States Magistrate Judge.    That complaint is attached hereto as Exhibit A and incorporated by reference.    As stated in the complaint and detailed herein, I am aware of the following:

a.    Early in the morning on or about October 29, 2018, MARC ANTRIM ("ANTRIM"), an off-duty Los Angeles County Sheriff's Department ("LASD") deputy, ERIC RODRIGUEZ, also known as "Rooster" ("RODRIGUEZ"), **MCBRIDE**, and others known and unknown were involved in the armed robbery of an indoor marijuana distribution warehouse, located on Commercial Street in Los Angeles, California.    ANTRIM, RODRIGUEZ, **MCBRIDE**, and at least two other co-conspirators stole approximately 600 pounds of marijuana and two safes containing about $100,000 in cash.

b.    At the time of the robbery, ANTRIM, **MCBRIDE**, and at least one of the other co-conspirators were armed and falsely portrayed themselves to warehouse security to be LASD deputies executing a search warrant.    During the armed robbery, which lasted approximately two hours, ANTRIM detained three employees working at the warehouse (two security guards and another employee) in the backseat of an official LASD Ford Explorer.

3

When Los Angeles Police Department ("LAPD") officers responded to a call for service at the warehouse, ANTRIM's co-conspirators fled. ANTRIM stayed behind and falsely told the LAPD officers that he was conducting a legitimate LASD-authorized search, thereby prompting the LAPD officers to leave the warehouse. After LAPD officers left, ANTRIM, RODRIGUEZ, MCBRIDE, and at least one of the other co-conspirators completed the robbery.

**B.   Surveillance Video Shows MCBRIDE Robbing the Warehouse with ANTRIM, While Armed and Purporting to be a Deputy**

8.   Based on my close and repeated review of the surveillance camera footage from the warehouse, review of photographs of **MCBRIDE**, and conversations with a law enforcement agent familiar with **MCBRIDE**, I believe that **MCBRIDE** is one of the co-conspirators who arrived at the warehouse with ANTRIM. As detailed herein, **MCBRIDE** was armed, purported to be a deputy to the victims, and personally assisted with the robbery.

9.   From my review of the surveillance video of the robbery, I know that one of the men who arrived with ANTRIM was wearing a duty belt with a holstered firearm and green jacket with what appeared to be LASD patches on the sleeve. Although he was wearing a hat, his face and a distinct tattoo on his neck were visible. Alcohol, Tobacco, Firearms & Explosives ("ATF") Special Agent Stephanie Romo has met **MCBRIDE** in person and reviewed the robbery surveillance footage multiple times. According to SA Romo, she believes **MCBRIDE** is the tattooed co-

4

conspirator who arrived with ANTRIM and falsely purported to be a deputy.[1]

## C. MCBRIDE Calls ANTRIM During the Robbery

10. From my review of the surveillance video of the robbery, I know that at approximately 3:43 a.m., several marked LAPD police cars began arriving at the warehouse. As the LAPD police cars arrived, ANTRIM walked toward the front gate of the warehouse's parking lot. At the same time, MCBRIDE and other co-conspirators fled the warehouse through a back roll-up door. MCBRIDE and one of his co-conspirators both discarded their LASD jackets as they fled.

11. From my review of the body camera footage from the responding LAPD officers[2], I know that ANTRIM then met with the officers.[3] He falsely told them that he was a LASD narcotics deputy executing a lawful search at the warehouse.[4] To facilitate the ruse, ANTRIM handed his phone to one of the officers so that the officer could speak to someone on the phone claiming to be ANTRIM's LASD sergeant. While the LAPD officer

---

[1] LASD Sergeant Investigator Vincent Choi ("Sergeant Choi") confirmed that MCBRIDE is not an LASD deputy.

[2] The footage contains both audio and video.

[3] Attached as Exhibits B and C are true and accurate photographs from the body camera footage from one of the responding LAPD officers. Exhibit B shows ANTRIM on his phone standing to the right of three LAPD officers. Exhibit C shows ANTRIM making a phone call in the presence of the LAPD officers to purportedly locate his "sergeant."

[4] According to Sergeant Choi, ANTRIM works as a patrol deputy at Temple Station in Temple City, California. He is not currently assigned to a narcotics unit, is not a detective, and would have no reason to investigate or execute a search warrant at the warehouse, which is located in the City of Los Angeles outside the areas served by the Temple City Station.

5

was holding ANTRIM's phone, there was an incoming call to
ANTRIM's phone.  When that incoming call came in, a photograph
of **MCBRIDE** appeared on the screen of ANTRIM's phone, which I
observed from the body camera footage.[5]

12.  At approximately the same time as that incoming call
to ANTRIM's phone (with **MCBRIDE**'s picture[6]), ANTRIM's phone
records[7] show an incoming call from phone number (949) 572-9265.
Subscriber records show that a phone with number (949) 572-9265
is registered to a woman with the last name "McBride."  Given
the subscriber information and the photograph that appears of
**MCBRIDE**, I believe that **MCBRIDE** was likely the user of the phone
with number (949) 572-9265 and that **MCBRIDE** was, in fact, the
individual calling ANTRIM.

13.  Based on my involvement in this investigation, I
believe it is likely that **MCBRIDE** was calling ANTRIM to see what
was happening with the LAPD officers who had arrived on scene
during the robbery.  As stated, **MCBRIDE** fled the warehouse when

[5] Based on my training and experience, as well as my
familiarity with digital devices, I know many cellular phones,
including iPhones, permit the user to select a photograph or
image to associate with a particular phone number.  This image
or photograph can be displayed when making or receiving a call
with this phone number.

[6] Based on my conversations with SA Romo, I know that the
photograph of **MCBRIDE** that appears on ANTRIM's phone screen
resembles a photograph of **MCBRIDE** that is posted on a social
media account associated with **MCBRIDE**.

[7] ANTRIM'S phone records were obtained pursuant to a federal
GPS and cell-site warrant issued by the Honorable Maria Audero,
United States Magistrate Judge, in case no. 18-MJ-2946, on
November 5, 2018.

6

the officers arrived and may have been seeking an update from
ANTRIM.

## D.   After the Robbery, the Penske Truck Carrying the Stolen Marijuana and Safes Goes to MCBRIDE's House

14.   Based on my review of the surveillance camera footage
from the warehouse, I know that ANTRIM, RODRIGUEZ, **MCBRIDE**, and
at least one other co-coconspirator loaded the stolen marijuana
and safes onto a large Penske rental truck (the "Penske Truck")
at the warehouse.  Based on my conversations with other law
enforcement agents, I know that there was a tracking device on
the Penske Truck that recorded the location of the truck during
and following the robbery.  This data was maintained by the
rental company in the regular course of business and not
activated at the request of the government.  A review of that
data shows that the Penske Truck went to a residence located at
1062 East Gladstone Street, Glendora, CA 91740 (the "Glendora
Residence") on or about October 29, 2018 after the robbery.

15.   According to agents surveilling ANTRIM on or about
November 5, 2018, they observed individuals loading one large
object covered by a tarp into the back of a truck at the
Glendora Residence.  The object looked similar in size and shape
to one of the safes stolen during the warehouse robbery.  Agents
saw ANTRIM, as well as a truck registered to RODRIGUEZ, at the
Glendora Residence around the time this object was being moved.
Agents also observed ANTRIM removing boxes from the Glendora
Residence and loading them into another vehicle.

16.   Based on law enforcement queries, I know that at least one vehicle (a black BMW 5 Series, with California license plate number 7MSP480) is registered to **MCBRIDE** at the Glendora Residence.   Law enforcement officers also told me that they observed **MCBRIDE** leave from the Glendora Residence in the black BMW on or about November 6, 2018.   Based on the agent surveillance, fact that **MCBRIDE**'s black BMW was registered to the Glendora Residence, and other information detailed herein regarding a search of the home, I believe that **MCBRIDE** resided at the Glendora Residence.

## E.   Agents Recover $150,000 to $200,000 in Cash, a Loaded Firearm, and Other Evidence from MCBRIDE's House

17.   On November 7, 2018, the Honorable Edward M. Infante, United States Magistrate Judge, issued a search warrant in case no. 18-MJ-2958 for the Glendora Residence.   Agents executed that search warrant on November 8, 2018.   SA Romo was present for the search and told me the following:

a.   **MCBRIDE** and his daughter (a minor) were present at the Glendora Residence when agents executed the search.

b.   Agents seized approximately $150,000 to $200,000 in cash.[8]   Next to some of the bundled stacks of cash was a handwritten note: "all bills bundles have been counted and banded it should be easy and fast to cqunt."

c.   Agents recovered a nine millimeter Beretta firearm, with a fully loaded magazine inserted into the firearm

_____

[8] The amount of cash recovered is pending an official count by the DEA.

8

with a round in the chamber. According to a law enforcement query of the firearm, ANTRIM was the registered owner. A box of law enforcement edition Winchester nine millimeter ammunition was also at the house.

d. Agents located a metal patrol-type flashlight with "Antrim" etched into it, an LASD field interview card in a book, and two-way radio.

e. Agents seized two bags each containing approximately 455 grams of marijuana. From her training and experience, SA Romo is familiar with marijuana and recognized the substance as marijuana based on its appearance, packaging, and odor. The two bags containing marijuana had serial numbers and bar codes, as if the marijuana had been packaged for commercial distribution.

f. Lastly, agents recovered men's boots resembling those worn by **MCBRIDE** during the robbery.

## F. Agents Recover $150,000 to $200,000 in Cash, Four Firearms, and Other Evidence from ANTRIM's House

18. On November 7, 2018, the Honorable Edward M. Infante, United States Magistrate Judge, issued a search warrant in case no. 18-MJ-2960 for ANTRIM's house. Agents executed that search warrant on November 8, 2018. DEA Group Supervisor Todd Boyett was present for the search and told me the following:

a. Agents seized approximately $150,000 to $200,000 in cash inside of a blue duffel bag in ANTRIM's bedroom.[9] (Based

---

[9] The amount of cash recovered is pending an official count by the DEA.

on my training and experience, I believe that the bedroom belonged to ANTRIM, because it also contained ANTRIM's business cards and law enforcement gear, among other things.) The cash was bundled in stacks with rubber bands.

        b.    Agents also recovered a total of four firearms:

        i.    One .380 caliber MAC-10 firearm, which is a submachine gun-style firearm;

        ii.    One .45 caliber Thompson submachine gun-style firearm;

        iii. One 12 gauge double-barrel shotgun; and

        iv.  One revolver.

        c.    Agents seized the revolver from ANTRIM's bedroom and the other three firearms from ANTRIM's garage. None of the seized firearms were loaded, although agents recovered various calibers of ammunition in the garage.

## IV.  Training and Experience Regarding Distribution Quantities of Marijuana and Possession of Firearms

19.  Based on my training and experience, knowledge of the investigation, and conversations with other agents who investigate narcotics crimes, it is my belief that ANTRIM, RODRIGUEZ, **MCBRIDE**, and their co-conspirators stole and subsequently possessed the marijuana from the warehouse for later distribution. The quantity of marijuana stolen was significantly in excess of a reasonable personal use amount for the group, and the coordinated nature of the robbery leads me to conclude that the suspects are involved in a money-making enterprise that would involve the re-sale of the stolen

marijuana. Finally, the recovery of firearms in the same location as the marijuana indicates that the suspects were prepared to protect the valuable merchandise that they had stolen.

## V. CONCLUSION

20. Based on the foregoing, I respectfully submit that there is probable cause to believe that **KEVIN MCBRIDE** engaged in a Conspiracy to Distribute Controlled Substances, in violation of 21 U.S.C. § 846, with MARC ANTRIM, ERIC RODRIGUEZ, also known as "Rooster," and others known and unknown.

$$/s/$$

ANDREW TRUONG
Special Agent
Drug Enforcement Administration

Subscribed to and sworn before
me this ___9th___ day of November,
2018.

ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE
ALKA SAGAR

11

# EXHIBIT A

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the Central District of California

FILED
CLERK, U.S. DISTRICT COURT

NOV 7 2018

CENTRAL DISTRICT OF CALIFORNIA
BY _____

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARC ANTRIM, and<br>ERIC RODRIGUEZ,<br>also known as "Rooster,"<br><br>Defendants. | Case No. **18MJ02983**<br><br>**(UNDER SEAL)** |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning on a date unknown, and continuing until at least the date of this complaint, in Los Angeles County, within the Central District of California, and elsewhere, defendants MARC ANTRIM and ERIC RODRIGUEZ, also known as "Rooster," and others known and unknown conspired and agreed with one another to knowingly and intentionally distribute controlled substances, in violation of the following:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to Distribute Controlled Substances |

This criminal complaint is based on these facts: Please see attached affidavit.

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Andrew Truong, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   11-7-2018

City and state:   Los Angeles, California

**EDWARD A. INFANTE**
*Judge's signature*

United States Magistrate Judge
*Printed name and title*

AUSAs: Lindsey Dotson (x4443), Joseph Axelrad (x7964)

Table of Contents

I.      INTRODUCTION .......................................... 1

II.     PURPOSE OF AFFIDAVIT ................................. 2

III.    PROPERTY TO BE SEARCHED ............................. 3

IV.     ITEMS TO BE SEIZED .................................. 4

V.      SUMMARY OF PROBABLE CAUSE ........................... 5

VI.     PROBABLE CAUSE ...................................... 6

        A.    Background ..................................... 6

        B.    Surveillance Video Captures ANTRIM, RODRIGUEZ,
              and Co-conspirators Robbing the Marijuana
              Distribution Warehouse While Armed and
              Purporting to be Deputies ...................... 7

        C.    ANTRIM Was Not Executing a Lawful Search
              Warrant ....................................... 13

        D.    The SUBJECT VEHICLE, PREMISES, and DEVICES ..... 14

VII.    TRAINING AND EXPERIENCE REGARDING THE SUBJECT
        OFFENSES ........................................... 20

        A.    Training and Experience Regarding Drug
              Trafficking ................................... 20

        B.    Training and Experience Regarding Public
              Corruption .................................... 26

VIII.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES.......... 29

IX.     CONCLUSION ......................................... 42

## AFFIDAVIT

I, ANDREW TRUONG, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA") and have been so employed since April 2015.  I am currently assigned to the DEA's Los Angeles Field Division, High Intensity Drug Trafficking Area Group 48 ("HIDTA 48"), investigating large-scale drug trafficking organizations operating in the Southern California area and elsewhere.

2.   I received 640 hours of narcotics law enforcement training at the DEA Basic Agent Training at the DEA Academy, Quantico, Virginia.  Through the DEA Academy and continuing education, I have received extensive training on conducting federal narcotics investigations, investigative techniques, running undercover operations, interviewing witnesses and subjects, developing sources, and search and seizure of evidence, among other things.

3.   Based on my training, experience, and conversations with other narcotics investigators, I am familiar with drug traffickers' methods of operation including the distribution, storage, and transportation of drugs, as well as the collection of drug proceeds and methods of money laundering used to conceal the nature of the proceeds.  I have received training and collaborated with other law enforcement officers regarding the unlawful importation, possession, and distribution of controlled

substances. Based on my experience and work with other law enforcement agents, I am familiar with public corruption statutes and money laundering statutes involving the proceeds of specified unlawful activities and conspiracies associated with criminal narcotics, in violation of Titles 18 and 21 of the United States Code. I also speak regularly with narcotics investigators at the federal, state, and local level, as well as drug traffickers and informants, regarding the manner in which drug traffickers store, sell, and transport narcotics.

4.    Prior to joining DEA, I was an Investigative Specialist with the Federal Bureau of Investigation ("FBI") in Los Angeles, California from September 2012 to April 2015. During my tenure with the FBI, I conducted surveillance operations and provided investigative support.

## II.    PURPOSE OF AFFIDAVIT

5.    This affidavit is made in support of a criminal complaint against, and arrest warrants for, ANTRIM MARC ANTRIM ("ANTRIM") and ERIC RODRIGUEZ, also known as "Rooster"[1] ("RODRIGUEZ"), for Conspiracy to Distribute Controlled Substances, in violation of 21 U.S.C. § 846. This affidavit is also made in support of search warrants for the SUBJECT VEHICLE, PREMISES, and DEVICES, as detailed herein and described in Attachments A-1 through A-8, for the items to be seized as

---

[1] Based on my involvement in this investigation and conversations with other law enforcement officers familiar with RODRIGUEZ, I am aware that he is also known as "Rooster."

2

Instrumentality Protocol

described in Attachment B.   Attachments A-1 through A-8 and B
are incorporated herein by reference.

6.    The facts set forth in this affidavit are based upon
my training and experience, review of recordings, and
information obtained from various law enforcement personnel and
witnesses.   This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint, arrest
warrants, and search warrants.   It does not purport to set forth
all of my knowledge of, or investigation into, this matter.
Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

### III.    PROPERTY TO BE SEARCHED

7.    This affidavit is made in support of a search warrant
for the following SUBJECT VEHICLE, PREMISES, and DEVICES:

a.    SUBJECT VEHICLE 1.   A white 2016 Dodge RAM truck
with vehicle identification number 3C63RPGL2GG139703 and
California license plate number 89372K2, as described in
Attachment A-1, for the items to be seized described in
Attachment B;

b.    SUBJECT PREMISES 2.   The premises located at 1062
East Gladstone Street, Glendora, CA 91740 ("SUBJECT PREMISES
2"), as described in Attachment A-2, for the items to be seized
described in Attachment B;

c.    SUBJECT PREMISES 3.   The premises located at
11754 East Stockton Street, Adelanto, CA 92301 ("SUBJECT

3

Instrumentality Protocol

PREMISES 3"), as described in Attachment A-3, for the items to be seized described in Attachment B;

d.   SUBJECT PREMISES 4.  The premises located at 11042 Andrews Street, South El Monte, CA 91733 ("SUBJECT PREMISES 4"), as described in Attachment A-4, for the items to be seized described in Attachment B;

e.   SUBJECT PREMISES 5.  An equipment bag locker bearing number "118" located at the Los Angeles County Sheriff's Department ("LASD") Temple Station, as described in Attachment A-5, for the items to be seized described in Attachment B;

f.   SUBJECT PREMISES 6.  A locker bearing number "130" located in the men's locker room at the LASD Temple Station, as described in Attachment A-6, for the items to be seized described in Attachment B;

g.   SUBJECT DEVICE 7.  Any digital device, including but not limited to a cellular telephone, in the possession, custody, or control of ANTRIM at the time of his arrest, as described in Attachment A-7, for the items to be seized described in Attachment B; and

h.   SUBJECT DEVICE 8.  Any digital device, including but not limited to a cellular telephone, in the possession, custody, or control of RODRIGUEZ at the time of his arrest, as described in Attachment A-8, for the items to be seized described in Attachment B.

## IV.   ITEMS TO BE SEIZED

8.   The items to be seized are the evidence, fruits, and instrumentalities of violations of the following: 21 U.S.C.

4

Instrumentality Protocol

§ 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances); 21 U.S.C. §§ 841(a)(1) (Distribution and Possession with Intent to Distribute Controlled Substances); 18 U.S.C. § 924(c) (Carrying or Using a Firearm in Furtherance of a Drug Trafficking Crime or Crime of Violence); 18 U.S.C. § 241 (Conspiracy Against Rights); 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law); 18 U.S.C. § 371 (Conspiracy); 18 U.S.C. § 666 (Federal Program Bribery); 18 U.S.C. § 1346 (Honest Services Fraud); 18 U.S.C. § 1956 (Money Laundering); and 18 U.S.C. § 1957 (Money Laundering in Property from Specified Unlawful Activity) (collectively, the "Subject Offenses"), as described in Attachment B.

## V. SUMMARY OF PROBABLE CAUSE

9. Early in the morning on or about October 29, 2018, ANTRIM, an off-duty LASD deputy sheriff, RODRIGUEZ, and others known and unknown were involved the robbery of an indoor marijuana distribution warehouse, located on Commercial Street in Los Angeles, California. ANTRIM, RODRIGUEZ, and their co-conspirators stole approximately 600 pounds of marijuana and two safes containing about $100,000 in cash.

10. At the time of the robbery, ANTRIM and at least two of his co-conspirators were armed and falsely portrayed themselves to be LASD deputies executing a search warrant or conducting other official business at the warehouse. During the robbery, which lasted approximately two hours, ANTRIM detained three employees working at the warehouse (two security guards and

5

Instrumentality Protocol

another employee) in the backseat of an official LASD Ford Explorer. When Los Angeles Police Department ("LAPD") officers responded to a call for service at the warehouse, ANTRIM falsely represented that he was conducting a legitimate search, thereby prompting the LAPD officers to leave the scene and allowing ANTRIM, RODRIGUEZ, and his co-conspirators time to complete the robbery.

## VI. PROBABLE CAUSE

### A. Background

11. Based on my conversations with LASD Sergeant Investigator Vincent Choi ("Sergeant Choi") and involvement in this investigation, I am aware that ANTRIM is an LASD deputy sheriff.[2] At the time of the robbery detailed herein, ANTRIM was not on duty. He works as a patrol deputy at Temple Station in Temple City, California. He is not currently assigned to a narcotics unit, is not a detective, and would have no reason to investigate or execute a search warrant of the marijuana distribution warehouse, which is located in the City of Los Angeles outside the areas served by the Temple City Station.[3]

12. According to Sergeant Choi, there is no record of RODRIGUEZ being employed as an LASD deputy sheriff.

---

[2] Sergeant Choi is a member of LASD's Internal Criminal Investigations Bureau, a section of the LASD charged with investigating crimes committed by LASD employees.

[3] According to www.temple.lasd.org (last visited November 4, 2018), the LASD Temple City Stations serves the Chantry Flats, Monrovia-Arcadia-Duarte area, City of Bradbury, City of Duarte, City of Rosemead, City of South El Monte, Temple City, North San Gabriel-East Pasadena area, and South San Gabriel. The marijuana distribution warehouse is in the jurisdiction patrolled by LAPD.

6

Instrumentality Protocol

**B.    Surveillance Video Captures ANTRIM, RODRIGUEZ, and Co-conspirators Robbing the Marijuana Distribution Warehouse While Armed and Purporting to be Deputies**

13.    Based on my conversations with Sergeant Choi, I am aware that an attorney at the law firm representing the owner of the marijuana distribution warehouse contacted Sergeant Choi on or about November 2, 2018. According to Sergeant Choi, the attorney stated the following:

a.    In the early morning hours of October 29, 2018, approximately 600 pounds of marijuana (packaged for bulk distribution) and two safes containing approximately $100,000 in United States currency were stolen from the warehouse by individuals purporting to be LASD deputies.

b.    An employee of the warehouse, who was present during the robbery, reported that one of the vehicles involved in the robbery had a California license plate bearing number 1488363.

c.    According to Sergeant Choi, a black Ford Explorer bearing California license plate number 1488363 is an LASD-registered vehicle assigned to the LASD Temple Station. ANTRIM, through his work at the LASD Temple Station, would have had access to this vehicle.

14.    Sergeant Choi also told me that the aforementioned attorney gave him security camera footage from the warehouse on two USB thumb drives. The footage was captured from approximately 32 cameras located throughout the warehouse and purports to show events at the warehouse from approximately 3:00 a.m. to 5:00 a.m. on or about October 29, 2018.

7

Instrumentality Protocol

15. I reviewed the security camera footage and observed the following:

a. At approximately 3:09 a.m.[4], a black unmarked Ford Explorer (the "Ford Explorer") drove by the warehouse.[5] At approximately 3:11 a.m., the Ford Explorer appeared on the driveway to the warehouse behind a closed gate. ANTRIM was the driver.[6] ANTRIM exited the car, got the attention of an individual believed to be a male security guard for the warehouse, and showed the guard a piece of paper inside a folder.[7] The security guard then opened the gate, and ANTRIM drove the Ford Explorer into the parking lot of the warehouse.

b. After ANTRIM drove the Ford Explorer into the parking lot, he and two other men exited the car. ANTRIM appeared to be wearing a duty belt[8] with a holstered firearm. (In later footage, it also appears that the two co-conspirators

_____

[4] The times are based on the timestamps I observed in the security footage.

[5] I conducted surveillance at the address provided to be by Sergeant Choi and observed a commercial-looking warehouse resembling what I observed in the surveillance video. It appeared to be a functioning business with multiple employees on the premises.

[6] Sergeant Choi told me that he has met ANTRIM in person. Sergeant Choi stated that he reviewed the footage and recognized the driver as ANTRIM. In addition, I have a reviewed an LASD personnel photograph of ANTRIM and also recognize ANTRIM as the driver of the Ford Explorer.

[7] Based on my training and experience and involvement in this investigation, it is possible that ANTRIM showed the guard a document purporting to be a search warrant for the warehouse in order to gain entry to the premises.

[8] A duty belt is a type of belt often worn by law enforcement officers that usually contains handcuffs, a radio, and a firearm, among other things.

8

Instrumentality Protocol

who arrived with ANTRIM were wearing duty belts, each with holstered firearms.) One of the co-conspirators who arrived with ANTRIM also appeared to be holding a long gun[9], possibly an assault rifle or shotgun. ANTRIM was wearing a green vest that said "sheriff." The other two were wearing green jackets with what appeared to be LASD patches on the sleeve.

   c.   ANTRIM then placed that security guard and another individual, who also appeared to be a male security guard, in the backseat of the Ford Explorer.

   d.   At approximately 3:15 a.m., ANTRIM approached the front door of the warehouse and displayed what appeared to be an LASD deputy sheriff badge to an unknown female employee sitting behind the front desk of the reception area. ANTRIM showed her a piece of paper in a folder. She then allowed ANTRIM and the two co-conspirators to enter the warehouse. She lifted her shirt to show her waist, as if to indicate to ANTRIM that she was unarmed. ANTRIM then returned to the Ford Explorer and drove it closer to the front door. He then placed the unknown female employee in the backseat of the Ford Explorer with the two male security guards.[10]

   e.   At approximately 3:21 a.m., a white Penske moving truck (the "Penske Truck") arrived at the warehouse and parked

---

[9] A long gun is a type of firearm with a longer barrel than other classes of firearms.

[10] DEA has not yet conducted interviews of these three witnesses or other employees who work at the warehouse. The existence of the investigation is not yet known to the public or targets, and openly conducting interviews at this time may comprise the integrity of the investigation and lead to the destruction of evidence or flight of subjects or targets.

9

Instrumentality Protocol

by the front door.  The driver of the Penske Truck appeared to be a third male co-conspirator.  He was in plain clothes and not wearing an LASD jacket.

f.  While at the warehouse, ANTRIM and his three co-conspirators removed multiple boxes, dark-colored garbage bags, and large clear bags of what appeared to be marijuana from the warehouse and placed the items into the Penske Truck.

g.  At approximately 3:43 a.m., several marked LAPD police cars began arriving at the warehouse.[11]  As the LAPD police cars arrived, ANTRIM walked toward the front gate of the warehouse's parking lot.  At the same time, the three co-conspirators fled the warehouse through a back roll-up door. Two of them discarded their LASD jackets.  One appeared to throw his LASD jacket and other items in a bush next to the warehouse. Another placed his LASD jacket on top of a portable basketball hoop stand near the back roll-up door before leaving.

h.  At approximately 3:50 a.m., ANTRIM appeared to meet with multiple LAPD officers who had arrived on scene.  At approximately 3:53 a.m., ANTRIM re-entered the warehouse.  He retrieved the discarded LASD jacket left on the portable basketball hoop stand, along with a duty belt that too had been left behind.  He took those items to the warehouse parking lot and put them in the trunk of the Ford Explorer.

---

[11] Sergeant Choi informed me that he reviewed LAPD calls for service on or about October 29, 2018 and learned that a caller reported that individuals purporting to be officers were attempting to execute a search warrant at the warehouse.

10

Instrumentality Protocol

i.    At approximately 3:57 a.m., ANTRIM met with multiple LAPD officers once again in the front parking lot of the warehouse.  At approximately 4:00 a.m., ANTRIM appeared to be on a cellular telephone as the group of LAPD officers stood near him.  At approximately 4:12 a.m., an LAPD officer appeared to be talking on the cellular telephone, which he then handed to ANTRIM at approximately 4:14 a.m.  Shortly thereafter, the LAPD officers left the warehouse parking lot.  Around that time, ANTRIM appeared to make at least one phone call.[12]

j.    At approximately 4:16 a.m., ANTRIM continued to load additional boxes containing clear plastic bags of what appeared to be marijuana into the back of the Penske Truck.

k.    At approximately 4:34 a.m., after the LAPD officers had left, a white Dodge RAM Dually pick-up truck (the "Dodge RAM Dually") arrived at the warehouse parking lot.  RODRIGUEZ was the driver.[13]  Another man, possibly one of the

---

[12] Sergeant Choi informed me that some of the responding LAPD officers were interviewed regarding their interaction with ANTRIM.  One of them said that ANTRIM handed him a cellular telephone that was in the middle of a call.  The screen of the phone displayed a particular individual's name, who is in fact another LASD deputy.  According to the LAPD officer, the person on the phone claimed that he was ANTRIM's sergeant and that ANTRIM was working in an official capacity.  According to Sergeant Choi, the individual with whom the LAPD officer purportedly spoke was not ANTRIM's sergeant.  Based on my training and experience and involvement in this investigation, I believe that the person on ANTRIM's phone falsely told the LAPD officer that he was ANTRIM's sergeant and that DEFEDANT was at the warehouse on official business.

[13] I have spoken with other law enforcement investigators who are familiar with RODRIGUEZ and have seen him in person.  Those investigators have reviewed screen shots of the video footage from the warehouse robbery and identified the driver of the Dodge RAM Dually as RODRIGUEZ.

11

Instrumentality Protocol

individuals previously at the warehouse with ANTRIM, got out of the Dodge RAM Dually. He and RODRIGUEZ then went inside the warehouse. Based on my training and experience and involvement in this investigation, I believe that the Dodge RAM Dually RODRIGUEZ drove to the warehouse is the same Dodge RAM that is registered to him (SUBJECT VEHICLE 1).[14]

l. At approximately 4:35 a.m., an unidentified co-conspirator, possibly one of the individuals previously at the warehouse with ANTRIM, approached the rear of the warehouse. He appeared to retrieve the LASD jacket and other items that had been previously discarded into the bushes. He then left the warehouse and returned shortly thereafter.

m. At approximately 4:50 a.m., ANTRIM, RODRIGUEZ, and two co-conspirators moved two large safes from the warehouse to the Penske Truck.

i. One black safe was approximately five feet tall and two feet deep and had a digital combination keypad, white lettering above the keypad, one chrome handle with approximately three spokes, and hinges on the right side of the safe when facing the front of the safe.

---

[14] According to law enforcement database queries, a 2016 Dodge RAM with vehicle identification number 3C63RPGL2GG139703 and California license plate number 89372K2 is registered to RODRIGUEZ. From the video, I observed that the license plate for the Dodge RAM Dually contained the numbers "9372" and therefore was consistent with the license plate for SUBJECT VEHICLE 1. Based on my experience, I know that a Dodge RAM Dually is a type of Dodge RAM. A Dually has four wheels in the back of the truck, as opposed to a standard vehicle with two wheels in the back.

12

ii.   The other black safe was approximately five feet tall and four feet deep and had one chrome handle with approximately five spokes.

n.   At approximately 4:56 a.m., RODRIGUEZ and two co-conspirators left the warehouse in the Penske Truck and Dodge RAM Dually.  ANTRIM then released the three warehouse employees from the back of the Ford Explorer and left.

C.   ANTRIM Was Not Executing a Lawful Search Warrant

16.   Based on my training and experience, review of the security camera footage described above, and conversations with other law enforcement officers, I do not believe that ANTRIM was acting in his official capacity to conduct a lawful search of the warehouse for the following reasons, among others:

a.   As noted, ANTRIM was not on duty.  He works as a patrol deputy at Temple Station in Temple City, California.  He is not currently assigned to a narcotics unit, is not a detective, and would have no reason to investigate or execute a search warrant of the warehouse, which is located in the City of Los Angeles outside the areas served by the Temple City Station.

b.   Sergeant Choi indicated to me that he has no evidence from his review of LASD records and conversations with others at LASD that there was any legitimate search warrant executed at the warehouse on or about October 29, 2018.  Based on my training and experience, the execution of a legitimate search warrant often requires extensive coordination with other on-duty law enforcement partners and would be known to others at LASD in order to dispatch appropriate resources and personnel to

13

Instrumentality Protocol

assist with the search and seizure, and to ensure officer safety. In addition, prior to executing a search, an operational plan with details regarding the anticipated search and seizure is usually submitted to a supervisor for review and approval. Sergeant Choi is unaware of ANTRIM submitting any operational plan.

c.    Finally, and most telling, when LAPD officers responded to the warehouse, ANTRIM's three co-conspirators fled. Two of them discarded their LASD jackets. They only returned to the warehouse after LAPD officers had left. Based on my training and experience, law enforcement officers conducting a search are not trained to leave the premises of a lawful search in this manner and do not shed their clothing or other paraphernalia identifying as them as law enforcement. In fact, legitimate law enforcement officers often wear clothing indicating that they are law enforcement for their own safety. Visual identifiers indicating who is law enforcement are important during a search so that an officer, particularly one carrying a firearm, is not advertently mistaken for a criminal. The fact that ANTRIM's co-conspirators fled and shed their LASD jackets shows consciousness of guilt that they knew they were not legitimate law enforcement conducting a legal search and seizure.

D.    The SUBJECT VEHICLE, PREMISES, and DEVICES

17.    SUBJECT VEHICLE 1.  SUBJECT VEHICLE 1 is a white 2016 Dodge RAM truck with vehicle identification number 3C63RPGL2GG139703 and California license plate number 89372K2,

14

Instrumentality Protocol

as described in Attachment A-1.  For the following reasons, among others, I believe that SUBJECT VEHICLE 1 is RODRIGUEZ's truck and is the same Dodge RAM Dually that RODRIGUEZ drove to the warehouse during the robbery:

a. From my review of the surveillance camera footage of the warehouse robbery, I observed RODRIGUEZ drive a white Dodge RAM Dually matching the description of SUBJECT VEHICLE 1 into the warehouse parking lot during the robbery.  Although I could not ascertain the entire license plate of the Dodge RAM Dually, I saw that it had the numbers "9372" in the middle of the license plate.  The license plate of the Dodge RAM Dually was therefore consistent with the license plate number for SUBJECT VEHICLE 1.  According to law enforcement queries, SUBJECT VEHICLE 1 has California license plate number 89372K2 and is registered to RODRIGUEZ.[15]

b. A law enforcement agent conducting an open source search of Facebook told me that she observed a photograph of RODRIGUEZ standing in front of a white truck matching the description of SUBJECT VEHICLE 1.

18. SUBJECT PREMISES 2.  SUBJECT PREMISES 2 is the premises located at 1062 East Gladstone Street, Glendora, CA 91740 ("SUBJECT PREMISES 2"), as described in Attachment A-2.  Based on my conversations with other law enforcement agents, I

---

[15] In addition to RODRIGUEZ, SUBJECT VEHICLE 1 is jointly registered to another individual at an address in Compton, California.  Based on my involvement in this investigation and conversations with other investigators, I believe that the address in Compton may be the home of a relative or associate of RODRIGUEZ.

15

Instrumentality Protocol

know that there was a tracking device on the Penske Truck that recorded the location of the truck during and following the robbery. This data was maintained by the rental company in the regular course of business and not activated at the request of the government. A review of that data shows that the Penske Truck went to SUBJECT PREMISES 2 on or about October 29, 2018 after the robbery. On or about November 5, 2018, agents surveilling ANTRIM observed individuals loading one large object covered by a tarp into the back of a truck at SUBJECT PREMISES 2. The object looked similar in size and shape to one of the safes stolen during the warehouse robbery. Agents observed ANTRIM, as well as SUBJECT VEHICLE 1 (RODRIGUEZ's Dodge RAM truck), at or near SUBJECT PREMISES 2 around the time this object was being moved. Agents also observed ANTRIM removing boxes from SUBJECT PREMISES 2 and loading them into another vehicle.[16]

19.  SUBJECT PREMISES 3.  SUBJECT PREMISES 3 is the premises located at 11754 East Stockton Street, Adelanto, CA 92301, as described in Attachment A-3. I believe that RODRIGUEZ resides at SUBJECT PREMISES 3 for the following reasons, among others:

a.  According to law enforcement queries, RODRIGUEZ is the property owner of SUBJECT PREMISES 3. He also has at least one vehicle registered to him at SUBJECT PREMISES 3.

---

[16] Although some evidence may have been removed from this location, based on my training and experience, I believe that evidence of the Subject Offenses is still likely to be found at this location.

16

Based on my training and experience, individuals often register vehicles to their home address or an address they frequent.

b.      Recent surveillance has shown RODRIGUEZ and SUBJECT VEHICLE 1 (which belongs to RODRIGUEZ) at SUBJECT PREMISES 3. A DEA task force officer informed me that he saw SUBJECT VEHICLE 1 parked on the driveway of SUBJECT PREMISES 3 at approximately 9:00 a.m. on or about November 5, 2018. He also saw RODRIGUEZ on the street immediately west of the driveway for SUBJECT PREMISES 3 the same day at approximately 9:10 a.m. At approximately 11:45 p.m. on or about November 5, 2018, a law enforcement officer observed SUBJECT VEHICLE 1 parked on the driveway of SUBJECT PREMISES 3. A law enforcement officer also observed RODRIGUEZ seated at a table inside the garage of SUBJECT PREMISES 3 (the garage door was open) the following day, on or about November 6, 2018 at approximately 1:00 p.m.

c.      GPS data for a phone believed to be used by RODRIGUEZ also suggests that RODRIGUEZ resides at SUBJECT PREMISES 3. On or about November 6, 2018 at approximately 12:40 a.m., DEA began receiving the data pursuant to a warrant.[17] According to law enforcement agents who have reviewed the data and are familiar with this case, GPS data indicated that the phone believed to be used by RODRIGUEZ was at or near SUBJECT

---

[17] On November 5, 2018, the Honorable Alka Sagar, United States Magistrate Judge, signed a warrant in case no. 18-MJ-2956 authorizing (1) the disclosure of historical cell-site information and prospective cell site and GPS information and (2) use of a cell-site simulator for two phones, including one believed to be used by RODRIGUEZ.

17

Instrumentality Protocol

b.    Furthermore, the historical cell-site data
obtained pursuant to the warrant on ANTRIM's phone suggests that
ANTRIM has been living at SUBJECT PREMISES 4 for at least a
month.    (Prior to that, cell-site data and other records suggest
that he was living elsewhere.)    An FBI special agent and trained
member of the FBI's Cellular Analysis Survey Team ("CAST")
conducted a preliminary analysis of the historical cell-site
data for ANTRIM's phone.    According to the agent, for the month
of October and continuing through the present, ANTRIM's phone
has connected to the cellular tower within approximately 400
meters of SUBJECT PREMISES 4 more often than to any other tower.
Moreover, based upon the agent's review of "beginning and ending
usage,"[20] it appears that ANTRIM is accessing the phone in the
vicinity of SUBJECT PREMISES 4 when he goes to sleep and then
again when he wakes up.    In light of this information, combined
with the law enforcement surveillance showing ANTRIM at SUBJECT
PREMISES 4 and my training and experience, I believe that ANTRIM
is currently residing at SUBJECT PREMISES 4.

21.    SUBJECT PREMISES 5.    SUBJECT PREMISES 5 is an
equipment bag locker bearing number "118" located at the LASD
Temple Station, as described in Attachment A-5.    According to
Sergeant Choi, SUBJECT PREMISES 5 is an equipment bag locker
assigned to ANTRIM.    Sergeant Choi told me that deputies usually

---

[20] When someone goes to sleep, they often will not send text
messages or make phone calls for an extended period of time.
This extended period of inactivity for text messages and phone
calls can be indicative of when an individual is sleeping.

19

Instrumentality Protocol

keep paperwork and equipment, such as a helmet or baton, in these lockers.

22. SUBJECT PREMISES 6. SUBJECT PREMISES 6 is a locker bearing number "130" located in the men's locker room at the LASD Temple Station, as described in Attachment A-6. According to Sergeant Choi, SUBJECT PREMISES 6 is a locker assigned to ANTRIM. Sergeant Choi told me that deputies usually keep articles of clothing, vests, handcuffs, duty belts, and other similar items in these lockers.

23. SUBJECT DEVICE 7. SUBJECT DEVICE 7 is any digital device, including but not limited to a cellular telephone, in the possession, custody, or control of ANTRIM at the time of his arrest, as described in Attachment A-7.

24. SUBJECT DEVICE 8. SUBJECT DEVICE 8 is any digital device, including but not limited to a cellular telephone, in the possession, custody, or control of RODRIGUEZ at the time of his arrest, as described in Attachment A-8.

VII. **TRAINING AND EXPERIENCE REGARDING THE SUBJECT OFFENSES**

A. **Training and Experience Regarding Drug Trafficking**

25. Based on my training and experience and conversations with agents and other law enforcement officers trained and experienced in narcotics investigations, I am familiar with the methods and modes of operation typically used by individuals trafficking in controlled substances. Based on conversations with other law enforcement officers and my knowledge of this investigation and others, I am aware of the following:

20

a.    Individuals involved in the illegal distribution
of controlled substances, or who possess controlled substances
with the intent to distribute to controlled substances, will
frequently keep records, documents, United States currency
derived from their criminal conduct, and other evidence
pertinent to their drug trafficking activities at their
residence and areas associated with their residence.  They often
conceal evidence of their drug trafficking in their residences,
as well as garages, carports, storage facilities, lockers,
outbuildings, and other surrounding areas to which they have
ready access.  Further, I know from my conversations with
Assistant United States Attorney Lindsey Greer Dotson ("AUSA
Dotson") that the case law in the Ninth Circuit establishes a
general presumption that individuals involved in drug
trafficking maintain evidence of their criminal activities in
their residences.[21]

b.    Drug traffickers, including individuals who
assist drug traffickers, will often conceal controlled
substances, proceeds of their illegal activity, and weapons in

---

[21]   AUSA Dotson provided me the following case citations:
"In the case of drug dealers, evidence is likely to be found
where the dealers live."  United States v. Angulo-Lopez, 791
F.2d 1394, 1399 (9th Cir. 1986) (citations omitted).
"[E]vidence discovered by [] officers linking the ANTRIMs to a
drug scheme provide[s] 'more than a sufficient showing for
obtaining the warrant to search [their]...residence.'"  United
States v. Fannin, 817 F.2d 1379, 1382 (9th Cir. 1987) (quotation
and citation omitted).  An unpublished decision refers to this
common-sense principle as the "residency presumption."  United
States. v. Crowell, 1993 WL 493743, *2 (9th Cir. 1993)
(unpublished).

21

Instrumentality Protocol

hidden compartments or manufactured spaces, including within the walls of their residences and garages, within furniture contained in their residences, and in compartments in their vehicles.

c.    The distribution of drugs is generally a continuing criminal activity taking place indefinitely unless interrupted by law enforcement action. Drug traffickers typically will obtain and distribute controlled substances on a regular basis, much as any distributor of a legitimate commodity would purchase stock for sale. Such traffickers will have an "inventory" which will fluctuate in size depending on the demand for the product.

d.    Drug traffickers begin distributing small quantities of controlled substances. As they develop their customer base and their supply contacts, they are able to deal in larger quantities. Those who are trafficking in distribution quantities of controlled substances, i.e. quantities significantly beyond those which are used for personal or recreational use (as is the case here), are not new to the business; rather, they have usually established their supply contacts and customers over months or years and are likely to have records of their past business, contacts, and customers in their residence.

e.    Drug traffickers, including individuals who assist drug traffickers, often have in their possession, including at their residence, firearms -- including handguns, pistols, revolvers, rifles, shotguns, machine guns, and/or other

22

Instrumentality Protocol

weapons, as well as ammunition and ammunition components -- that are used to protect and secure the drug traffickers' property. In addition, as was the case here, firearms are often used to facilitate the theft of controlled substances and cash. Some of the firearms and other protective gear used by the robbers in this case may be issued by a law enforcement agency and thus may be stored in official lockers or containers.

f.   Drug traffickers, including individuals who assist drug traffickers, often have in their possession large amounts of cash from their criminal endeavors. Drug traffickers generally sell controlled substances for cash. Because drug traffickers generally sell controlled substances for cash, they typically have significant amounts of cash on hand, as proceeds of sales and to purchase their own supplies. In addition, drug traffickers and those who assist drug traffickers often have other assets generated by their criminal conduct or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables. They often keep these items, and records reflecting their purchase or sale, such as automobile titles or deeds to property, as well as evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money acquired from engaging in drug trafficking activities, in their residences, offices, garages, storage buildings, lockers, automobiles, and safe deposit boxes.

g.   Drug traffickers, including individuals who assist drug traffickers, often attempt to conceal the proceeds

23

Instrumentality Protocol

of their criminal activity through money laundering transactions to make it appear as though the proceeds were derived from a legitimate source.

h.    Drug traffickers, including individuals who assist drug traffickers, often communicate with co-conspirators using coded or vague language to thwart the detection of law enforcement.    Therefore, documents, notes, communications, or other records evidencing criminal conduct may be in coded or vague language.

i.    Drug traffickers, including individuals who assist drug traffickers, often use one or more telephones, pagers, or other digital devices to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances, and for arranging transport and security of the same as well as for the disposition of proceeds from the sale of controlled substances. For instance, in this case, I know that ANTRIM used a cellular phone to contact an individual who purported to be ANTRIM's sergeant and who falsely told an LAPD officer that ANTRIM was at the warehouse on official business.    In addition, it is possible that ANTRIM used his cellular phone to inform his co-conspirators who had fled the warehouse that the LAPD officers had left and that it was safe to return.

j.    Furthermore, I know that professional drug trafficking operations depend upon maintaining both long-distance and local contacts with both suppliers and those down the organizational chain to the local traffickers.    They often

24

Instrumentality Protocol

use fraudulent information to subscribe to communication facilities, especially cellular telephones, maintain separate customer and supplier telephones, and frequently change communications facilities to thwart law enforcement efforts to intercept their communications. They frequently use pre-paid telephones and/or false or misleading subscriber information as a way of distancing themselves from criminal liability.

k.    Data contained on digital devices used by drug traffickers and their co-conspirators often includes, among other things, records of telephone calls, text messages, and e-mail communications between the trafficker and the co-conspirators; Global Positioning System ("GPS") information and other location information that can help identify stash locations, meeting places, and trafficking routes; and identifying information about the trafficker and co-conspirators, such as contact lists, calendar appointments, and photographs or videos.

l.    Drug traffickers, including individuals who assist drug traffickers, often maintain in their residences documents relating to their communication devices, in the form of receipts, bills, telephone and address books, and other books and papers that reflect, among other things, the names, addresses, and/or telephone numbers of their customers, co-conspirators, and associates in the drug trafficking organization.

m.    Drug traffickers commonly provide controlled substances to trusted distributors in their organization on

25

credit and commonly obtain controlled substances from their suppliers on credit. Therefore, I am aware that drug traffickers maintain books, records, customer lists, receipts, notes, ledgers, and other papers relating to the transportation, receipt, ordering, sales, and distribution of narcotics, narcotics proceeds, and equipment, and that such documents may be in code to attempt to thwart law enforcement detection.

n.  Drug traffickers, including individuals who assist drug traffickers, keep records of their illegal activities for a period of time extending beyond the time during which they actually possesses particular controlled substances, in order to maintain contact with criminal associates for future transactions, and to have records of prior transactions for which they might still be owed payment or might owe someone else money.

o.  Drug traffickers, including individuals who assist drug traffickers, generally continue their criminal activity for extensive periods of time, ordinarily indefinitely. Indeed, individuals who have established an income based on drug sales or distribution tend to continue the activity for prolonged periods of time because that is how they make or supplement their living and maintain the lifestyle to which they have become accustomed.

B.  **Training and Experience Regarding Public Corruption**

26.  ANTRIM is a deputy sheriff -- and therefore a public official -- who has used his status as a law enforcement officer to undermine and thwart the detection of legitimate law

26

Instrumentality Protocol

enforcement. Based on my training and experience investigating narcotics crimes, knowledge of this investigation and others, and my conversations with law enforcement officers trained to investigate public corruption crimes, I am familiar with the methods and modes of operation utilized by corrupt law enforcement officers engaged in drug trafficking and other crimes. In particular, based on my training and experience, knowledge of this investigation and others, and conversations with other law enforcement officers, I am aware of the following:

a.     Because many public officials do not gain tremendous wealth from their government paycheck alone, it is important for those involved in criminal activities to conceal unexplained wealth and unexplained cash, often including from their family and friends. It is common practice for individuals engaged in public corruption and fraud crimes to store and hide United States currency and financial instruments fraudulently or inappropriately obtained in their residences, home offices, garages, and safe deposit boxes. They often possess safes, locked containers, and/or hidden containers at their residence in order to store and conceal proceeds of the crime. In addition, they often have safe deposit boxes and off-site storage facilities to store and hide proceeds of their crimes and possess the keys and other related documents to those boxes and storage facilities at their residence.

b.     It is also common practice for individuals engaged in public corruption and fraud crimes to store other

27

Instrumentality Protocol

evidence of their criminal conduct -- such as records of past bribe payments or contact information for individuals involved in the corrupt scheme -- at their residences.

c.     Individuals involved in public corruption or fraud crimes often attempt to conceal the proceeds of their criminal activity through money laundering transactions to make it appear as though the proceeds were derived from a legitimate source.

d.     Individuals engaged in public corruption and fraud crimes often have other assets generated by their criminal conduct, or purchased with cash earned in order to conceal large cash proceeds, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.  These individuals often keep these items, and records reflecting their purchase or sale, such as automobile titles or deeds to property, as well as evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money acquired from engaging in their criminal activities, in their residences, home offices, garages, lockers, automobiles, and safe deposit boxes.  They do this in order to keep track of the value of the items and the cash they have received from their illicit activities.

e.     Individuals engaged in public corruption and fraud crimes often use one or more telephones, pagers, or other digital devices to discuss the corrupt scheme and payments. Data contained on digital devices used by individuals engaged in public corruption and fraud crimes often include, among other

28

Instrumentality Protocol

things, records of telephone calls, text messages, and e-mail communications between the target and other co-conspirators; Global Positioning System ("GPS") information and other location information that can help identify meeting places; and identifying information about the target and other co-conspirators paying bribes, such as contact lists, calendar appointments, and photographs or videos.

      f.    Individuals engaged in public corruption and fraud crimes often maintain in their residences documents relating to their communication devices, in the form of receipts, bills, telephone and address books, and other books and papers that reflect, among other things, the names, addresses, and/or telephone numbers of their co-conspirators in the corrupt scheme.

## VIII.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES

    27.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy

29

Instrumentality Protocol

disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.     Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory

30

Instrumentality Protocol

or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

    c.   The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

    d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an

31

active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

            e.    Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image

32

Instrumentality Protocol

as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

          f.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone

                              33

                    Instrumentality Protocol

else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

g.    Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

34

Instrumentality Protocol

28.   As discussed herein, based on my training and experience, I believe that digital devices will be found during the search.  For instance, based on my review of the surveillance video, I observed ANTRIM using a cellular phone during the robbery in an effort, it appeared, to communicate with co-conspirators.  The cellular phone I observed ANTRIM using appeared to be a smartphone, which is a multi-purpose mobile computing device.  Based on my experience, smartphones are a more advanced type of cellular phone that usually have a biometric unlock feature.

a.   I know from my training and experience and my review of publicly available materials that several hardware and software manufacturers offer their users the ability to unlock their devices through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint-recognition, face-recognition, iris-recognition, and retina-recognition.  Some devices offer a combination of these biometric features and enable the users of such devices to select which features they would like to utilize.

b.   If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple Inc. ("Apple") offers a feature on some of its phones and laptops called "Touch ID," which allows a user to register up to five

35

fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which on a cell phone is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the phone, and on a laptop is located on the right side of the "Touch Bar" located directly above the keyboard.  Fingerprint-recognition features are increasingly common on modern digital devices.  For example, for Apple products, all iPhone 5S to iPhone 8 models, as well as iPads (5th generation or later), iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro laptops with the Touch Bar are all equipped with Touch ID. Motorola, HTC, LG, and Samsung, among other companies, also produce phones with fingerprint sensors to enable biometric unlock by fingerprint.  The fingerprint sensors for these companies have different names but operate similarly to Touch ID.

    c. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  To activate the facial-recognition feature, a user must hold the device in front of his or her face.  The device's camera analyzes and records data based on the user's facial characteristics.  The device is then automatically unlocked if the camera detects a face with

Instrumentality Protocol

characteristics that match those of the registered face.  No
physical contact by the user with the digital device is
necessary for the unlock, but eye contact with the camera is
often essential to the proper functioning of these facial-
recognition features; thus, a user must have his or her eyes
open during the biometric scan (unless the user previously
disabled this requirement).  Several companies produce digital
devices equipped with a facial-recognition-unlock feature, and
all work in a similar manner with different degrees of
sophistication, e.g., Samsung's Galaxy S8 (released Spring
.2017) and Note8 (released Fall 2017), Apple's iPhone X (released
Fall 2017).  Apple calls its facial-recognition unlock feature
"Face ID."  The scan and unlock process for Face ID is almost
instantaneous, occurring in approximately one second.

      d.    While not as prolific on digital devices as
fingerprint- and facial-recognition features, both iris- and
retina-scanning features exist for securing devices/data.  The
human iris, like a fingerprint, contains complex patterns that
are unique and stable.  Iris-recognition technology uses
mathematical pattern-recognition techniques to map the iris
using infrared light.  Similarly, retina scanning casts infrared
light into a person's eye to map the unique variations of a
person's retinal blood vessels.  A user can register one or both
eyes to be used to unlock a device with these features.  To

37

Instrumentality Protocol

activate the feature, the user holds the device in front of his or her face while the device directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data from the person's eyes. The device is then unlocked if the camera detects the registered eye. Both the Samsung Galaxy S8 and Note 8 (discussed above) have iris-recognition features. In addition, Microsoft has a product called "Windows Hello" that provides users with a suite of biometric features including fingerprint-, facial-, and iris-unlock features. Windows Hello has both a software and hardware component, and multiple companies manufacture compatible hardware, e.g., attachable infrared cameras or fingerprint sensors, to enable the Windows Hello features on older devices.

29. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

30. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features have been enabled. This can

38

occur when a device has been restarted or inactive, or has not
been unlocked for a certain period of time.  For example, with
Apple's biometric unlock features, these circumstances include
when: (1) more than 48 hours has passed since the last time the
device was unlocked; (2) the device has not been unlocked via
Touch ID or Face ID in eight hours and the passcode or password
has not been entered in the last six days; (3) the device has
been turned off or restarted; (4) the device has received a
remote lock command; (5) five unsuccessful attempts to unlock
the device via Touch ID or Face ID are made; or (6) the user has
activated "SOS" mode by rapidly clicking the right side button
five times or pressing and holding both the side button and
either volume button.  Biometric features from other brands
carry similar restrictions.  Thus, in the event law enforcement
personnel encounter a locked device equipped with biometric
features, the opportunity to unlock the device through a
biometric feature may exist for only a short time.  I do not
know the passcodes of the devices likely to be found during the
search.

     31.  In my training and experience, the person who is in
possession of a device or has the device among his or her
belongings at the time the device is found is likely a user of
the device.  However, in my training and experience, that person
may not be the only user of the device whose physical
characteristics are among those that will unlock the device via
biometric features (such as with Touch ID devices, which can be
registered with up to five fingerprints), and it is also

                    Instrumentality Protocol

possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual who is found at the SUBJECT PREMISES and reasonably believed by law enforcement to be a user of the device to unlock the device using biometric features in the same manner as discussed in the following paragraph.

32. For these reasons, if while executing the warrant, law enforcement personnel encounter a digital device that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to every adult person who is located at the SUBJECT PREMISES during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that is (a) located at the SUBJECT PREMISES and (b) falls within the scope of the warrant: (1) compel the use of the person's thumb- and/or fingerprints on the device(s); and (2) hold the device(s) in front of the face of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature. With respect to fingerprint sensor-enabled devices, although I do not know which of the fingers are authorized to access any given device, I know

40

based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors; and, in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

33.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

///

41

Instrumentality Protocol

## IX. CONCLUSION

34. Based on the foregoing, I respectfully submit that there is probable cause to believe that MARC ANTRIM, ERIC RODRIGUEZ, also known as "Rooster," and others known and unknown, engaged in a Conspiracy to Distribute Controlled Substances, in violation of 21 U.S.C. § 846.

35. Furthermore, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses, will be found at or in the SUBJECT VEHICLE, PREMISES, and DEVICES, as described in Attachments A-1 through A-8.

_____
ANDREW TRUONG
Special Agent
Drug Enforcement Administration


Subscribed to and sworn before
me this _7_ day of November,
2018.

**EDWARD A. INFANTE**

_____
UNITED STATES MAGISTRATE JUDGE


42

## ATTACHMENT A-1

### VEHICLE TO BE SEARCHED

A white 2016 Dodge RAM truck with vehicle identification number 3C63RPGL2GG139703 and California license plate number 89372K2 ("SUBJECT VEHICLE 1").

ATTACHMENT A-2

## PREMISES TO BE SEARCHED

The premises located at 1062 East Gladstone Street, Glendora, CA 91740 ("SUBJECT PREMISES 2"). SUBJECT PREMISES 2 is a single-story residence. SUBJECT PREMISES 2 is located on the south side of East Gladstone Street. The residence has a dark-colored roof. The exterior of the residence is white with a blue/gray trim. A concrete walkway leads from the sideway to a red or brown front door. SUBJECT PREMISES 2 has a garage that faces a rear alley. SUBJECT PREMISES 2 includes any and all vehicles, storage facilities, outbuildings, and garages within the curtilage of the premises.

## ATTACHMENT A-3

### PREMISES TO BE SEARCHED

The premises located at 11754 East Stockton Street, Adelanto, CA 92301 ("SUBJECT PREMISES 3"). SUBJECT PREMISES 3 is a single-story residence located on the north side of East Stockton Street. It has a tile roof, two-car garage, and white concrete driveway leading to the garage from the street. The front door is on the left side of the garage, and there are windows on each side of the front door. SUBJECT PREMISES 3 includes any and all vehicles, storage facilities, outbuildings, and garages within the curtilage of the premises.

## ATTACHMENT A-4

### PREMISES TO BE SEARCHED

The premises located at 11042 Andrews Street, South El Monte, CA 91733 ("SUBJECT PREMISES 4"). SUBJECT PREMISES 4 is a single-story residence located on the corner of Andrews Street and Lexham Avenue. The residence is brown in color with a brown roof and black metal gate surrounding part of the property. A concrete driveway goes from Andrews Street to a detached two-car garage in the rear. SUBJECT PREMISES 4 includes any and all vehicles, storage facilities, outbuildings, and garages within the curtilage of the premises.

ATTACHMENT A-5

### PREMISES TO BE SEARCHED

An equipment bag locker bearing number "118" ("SUBJECT PREMISES 5") located at the Los Angeles Sheriff's Department Temple Station, 8838 Las Tunas Drive, Temple City, CA 91780. SUBJECT PREMISES 5 is beige in color and approximately 2.5 feet wide and 2.5 feet deep. SUBJECT PREMISES 5 has the number "118" on the door.

## ATTACHMENT A-6

### PREMISES TO BE SEARCHED

A locker bearing number "130" ("SUBJECT PREMISES 6") located inside the men's locker room at the Los Angeles Sheriff's Department Temple Station, 8838 Las Tunas Drive, Temple City, CA 91780. SUBJECT PREMISES 6 is green in color. On the front of SUBJECT PREMISES 6 is the number "130" and a sticker that says "Tacos Omana."

## ATTACHMENT A-7

### DEVICES TO BE SEARCHED

Any digital device, including but not limited to a cellular telephone, in the possession, custody, or control of MARC ANTRIM, date of birth 10-27-1977, at the time of his arrest.

## ATTACHMENT A-8

### DEVICES TO BE SEARCHED

Any digital device, including but not limited to a cellular telephone, in the possession, custody, or control of ERIC RODRIGUEZ, also known as "Rooster," date of birth 11-24-1985, at the time of his arrest.

ATTACHMENT B

## I.   ITEMS TO BE SEIZED

1.   The items to be seized are the fruits, instrumentalities, and evidence of violations of 21 U.S.C. § 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances); 21 U.S.C. §§ 841(a)(1) (Distribution and Possession with Intent to Distribute Controlled Substances); 18 U.S.C. § 924(c) (Carrying or Using a Firearm in Furtherance of a Drug Trafficking Crime or Crime of Violence); 18 U.S.C. § 241 (Conspiracy Against Rights); 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law); 18 U.S.C. § 371 (Conspiracy); 18 U.S.C. § 666 (Federal Program Bribery); 18 U.S.C. § 1346 (Honest Services Fraud); 18 U.S.C. § 1956 (Money Laundering); and 18 U.S.C. § 1957 (Money Laundering in Property from Specified Unlawful Activity) (collectively, the "Subject Offenses"):

a.   Any controlled substance, including but not limited to marijuana;

b.   Any items or paraphernalia used for manufacturing, distributing, packaging, and/or weighing controlled substances, including, but not limited to: plastic baggies, scales, and other weighing devices;

c.   Any items used in the packaging of currency for consolidation and transportation, including, but not limited to: money-counting machines, money wrappers, rubber bands, duct tape or wrapping tape, plastic wrap, and plastic sealing machines;

i

Instrumentality Protocol

d.    Any records, documents, programs, applications, or materials showing payment, receipt, concealment, transfer, or movement of money generated from the sale or distribution of marijuana or other controlled substances or from bribery payments, including but not limited to: bank account records, wire transfer records, bank statements, pay-owe sheets, receipts, safe deposit box keys and records, money containers, financial records, and notes, including documents written in vague or coded language;

e.    Any drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed;

f.    Jackets or other clothing with the word "sheriff" or other law enforcement identifiers;

g.    Law enforcement duty belt and related equipment, including but not limited to: handcuffs, batons, flashlight, gloves, and radio;

h.    Records or documents purporting to be, or relating to, search warrants;

i.    One black safe that is approximately five feet tall and two feet deep and has a digital combination keypad, white lettering above the keypad, one chrome handle with approximately three spokes, and hinges on the right side of the safe when facing the front of the safe;

ii

Instrumentality Protocol

j.    One black safe that is approximately five feet tall and four feet deep and has one chrome handle with approximately five spokes;

k.    Any United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks and traveler's checks);

l.    Any records, documents, programs, applications, or materials reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other valuable items;

m.    Any records, documents, programs, applications, or materials reflecting the names, addresses, telephone numbers, or communications of members or associates involved in drug trafficking activities or a bribery scheme, including but not limited to: personal telephone books, address books, telephone bills, photographs, videotapes, facsimiles, personal notes, receipts, and documents;

n.    Any weapons, including but not limited to: knives, firearms (including pistols, handguns, shotguns, rifles, assault weapons, and machine guns), magazines used to hold ammunition, silencers, and components of firearms (including components or tools which can be used to modify firearms or ammunition);

o.    Any indicia of occupancy, residency, or ownership of the SUBJECT VEHICLE, PREMISES, and DEVICES and things described in the warrant, including, but not limited to: forms of personal identification, records relating to utility bills, telephone bills, loan payment receipts, rent receipts, trust

iii

Instrumentality Protocol

deeds, lease or rental agreements, addressed envelopes, escrow documents, keys, letters, mail, canceled mail envelopes, or clothing;

      p.    Any documents or records referencing the rental of trucks or other vehicles used to commit the Subject Offenses; and

      q.    Any digital device used to facilitate the above-listed violations and forensic copies thereof.

      r.    With respect to any digital device used to facilitate the above-listed Subject Offenses or containing evidence falling within the scope of the foregoing categories of items to be seized:

      i.    Evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      ii.    Evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      iii. Evidence of the attachment of other devices;

      iv.    Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

iv

v.      Evidence of the times the device was used;

vi.     Passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. Applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.   Records of or information about Internet Protocol addresses used by the device; and

ix.    Records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony

Instrumentality Protocol

PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.    SEARCH PROCEDURE FOR DIGITAL DEVICES

4.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the digital device(s) beyond this 120-day period without first obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of

vi

the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c. If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending).  Otherwise, the government must return the device.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling

viii

outside the scope of the items to be seized absent further order of the Court.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

        a.    Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

        b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

        c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

        d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

        e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

        f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

ix

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    During the execution of this search warrant, with respect to a person who is in possession of a SUBJECT DEVICE or any adult person who is located at the SUBJECT PREMISES during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that is located at the SUBJECT PREMISES and falls within the scope of the warrant, the law enforcement personnel are authorized to: (1) depress the thumb and/or fingerprints of the person onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the person with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

7.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

x

Instrumentality Protocol

# EXHIBIT B



# EXHIBIT C

